## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  ROCK ISLAND DIVISION
 3
    SIDNEY HARRIS, #M-37506,        )
 4                                  )
         Plaintiff,                 )
 5                                  )
    vs.                             ) Cause No. 18-4095
 6                                  )
    CRAIG JONES, et al.,            )
 7                                  )
         Defendants.                )
 8
 9
10
11
12      VIDEO-CONFERENCE DEPOSITION OF SIDNEY HARRIS
            Taken on behalf of the Defendants
13                   May 22nd, 2019
14
15
16      Jamie Jo Kinder, CCR 842, CSR 084.003306
17
18
19
20
21
22
23
24
```

## Page 3

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                  ROCK ISLAND DIVISION
 3
 4  SIDNEY HARRIS, #M-37506,        )
                                    )
 5       Plaintiff,                 )
                                    )
 6  vs.                             ) Cause No. 18-4095
                                    )
 7  CRAIG JONES, et al.,            )
                                    )
 8       Defendants.                )
 9
10      VIDEO-CONFERENCE DEPOSITION OF WITNESS, SIDNEY
11  HARRIS, produced, sworn, and examined on the 22nd day of
12  May, 2019, between the hours of 9:57 o'clock in the forenoon
13  and 1:14 o'clock in the afternoon of that day, at Assistant
14  Attorney General's Office, 500 South Second Street,
15  Springfield, IL, before Jamie Jo Kinder, Missouri CCR 842,
16  Illinois CSR 08-003306, a Certified Shorthand Reporter
17  within and for the State of Illinois, in a certain cause
18  now pending before the United States District Court for the
19  Central District of Illinois, Rock Island Division, wherein
20  SIDNEY HARRIS, #M-37506 is the Plaintiff, and CRAIG
21  JONES, et al., are the Defendants.
22
23
24
```

## Page 2

```
 1                I N D E X
 2                                     Page
 3                EXAMINATION
 4  QUESTIONS BY MS. McNAUGHT              5
 5  QUESTIONS BY MS. PATEL                76
 6  QUESTIONS BY MS. McNAUGHT            104
 7  QUESTIONS BY MS. PATEL              122
 8
 9
10
11
12
13              (No exhibits marked.)
14
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1                A P P E A R A N C E S
 2  For the Plaintiff:
 3  Ms. Karen L. McNaught
 4  CASSIDAY SCHADE, LLP
 5  111 North 6th Street, 2nd Floor
    Springfield, IL  62701
 6  kmcnaught@cassiday.com
 7  For the Defendants:
 8  Ms. Hinal A. Patel
    ASSISTANT ATTORNEY GENERAL
 9  500 South Second Street
    Springfield, IL  62701
10  (217) 557-7081
    hpatel@atg.state.il.us
11
12
13  The Court Reporter:
14  Ms. Jamie Jo Kinder, CCR, CSR
    ALARIS LITIGATION SERVICES
15  711 North Eleventh Street
    St. Louis, MO  63101
16  (800) 280-3376
    www.alaris.us
17  transcripts@alarislitigation.com
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

## Page 5

1    (Deposition commenced at 9:57 a.m.)
2        IT IS HEREBY STIPULATED AND AGREED, by and between
3    counsel for Plaintiff and counsel for Defendants, that the
4    deposition of SIDNEY HARRIS, #M-37506 may be taken in
5    shorthand by Jamie Jo Kinder, CCR, CSR, a notary public and
6    shorthand reporter, and afterwards transcribed into
7    typewriting; and the signature of the witness is expressly
8    reserved.
9            * * * * *
10            SIDNEY HARRIS,
11    of lawful age, being produced, sworn and examined on
12    behalf of the Defendants, deposes and says:
13            EXAMINATION
14    QUESTIONS BY MS. McNAUGHT:
15        Q    For the record, would you please state your
16    full name?
17        A    Sidney Harris.
18        Q    And do you have an IDOC registration number?
19        A    Yes.
20        Q    What is that?
21        A    M, as in Mary, 37506.
22        Q    Have you ever had your deposition taken
23    before?
24        A    No.

## Page 6

1        Q    Before we went on the record, I did explain to
2    you what a deposition was; is that correct?
3        A    Yes.
4        Q    And I told you that you would be placed under
5    oath by the court reporter; is that correct?
6        A    Yes.
7        Q    And I told you that because you're under oath,
8    you would be required to answer the questions as posed and
9    that you would need to give truthful answers. Did you
10    understand that?
11        A    Yes.
12        Q    And I also told you that we would go through
13    some of the other rules of a deposition, didn't I?
14        A    Yes.
15        Q    So let's go through those right now. If you
16    don't understand a question that is posed to you by one of
17    the attorneys, please let us know so that we can either
18    repeat it or rephrase it. Does that make sense to you?
19        A    Yes.
20        Q    If you don't hear because -- and we're by
21    video, so if you don't hear a question, let us know that
22    you don't hear it; is that fair?
23        A    Yes.
24        Q    One of the other rules is that it's important

## Page 7

1    not to talk over each other because there is a court
2    reporter here and she's going to take down what we say and
3    what you say, so even if you think that you know what the
4    question is going to be, wait for -- wait for us to finish
5    before you respond, and we'll try and do the same by not
6    talking over you while you're responding; is that fair?
7        A    Understood.
8        Q    If you need a break, let us know that you need
9    a break. Okay?
10        A    Yes.
11        Q    If you answer a question, we're going to go
12    ahead and assume that you understood the question that's
13    posed to you. Does that make sense?
14        A    Yes.
15        Q    And you do understand that you're under oath;
16    is that right?
17        A    Yes.
18        Q    When you filed your lawsuit, did you have any
19    help in writing your -- or drafting your complaint or did
20    you do that by yourself?
21        A    By myself.
22        Q    What's your highest level of education?
23        A    Some college.
24        Q    Were you transferred directly from a juvenile

## Page 8

1    facility to the Illinois Department of Corrections?
2        A    Yes.
3        Q    How old were you when you transferred?
4        A    Twenty.
5        Q    Did you just age out at the juvenile facility
6    or is that why you were transferred to the Department of
7    Corrections?
8        A    I did not age out in the juvenile facility.
9    The maximum age is 21 for you to be placed mandatory in
10    IDOC custody from Juvenile Justice. I was 20 when I got
11    transferred, and the reason why I got transferred into IDOC
12    is because I was on juvenile parole, but I pled guilty to
13    an adult case, so I was then transferred into an adult
14    facility to do my time.
15        Q    So I just want to make sure I understand. The
16    crime that you are incarcerated for now was charged as an
17    adult crime; is that right?
18        A    Yes.
19        Q    But you were too young to enter the Department
20    of Corrections when you pled; is that correct?
21        A    No.
22        Q    You could have been placed in an IDOC -- IDOC
23    facility when you pleaded? Well, I'll just ask you: Why
24    is it that you were placed in a juvenile facility

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 9

1  initially?

2      A   As I stated in the beginning, I was on

3  juvenile supervision, juvenile parole.

4      Q   And did you commit another crime while you

5  were on parole?

6      A   Yes.

7      Q   Okay.  I understand now.  Thank you.

8      A   May I ask what's that have to do with the case

9  at hand?

10     A   Sure.  There's some medical records that

11  apparently are at the juvenile facility, and I wasn't sure

12  if those had anything to do with the case here now and

13  whether we needed to get those, but it doesn't sound like

14  it is.  So we're just going to — I'm not going to go into

15  that unless it becomes apparent that we do need those; is

16  that fair?

17     A   Yes.

18     Q   Okay.  I am just trying to figure out if we

19  have the records that we need, that's all.

20     A   Okay.

21     Q   And you didn't have a knee problem while you

22  were at the juvenile facility, did you?

23     A   No.

24     Q   Okay.  That knee problem occurred in May of

## Page 10

1  2016; is that right?

2      A   Yes.

3      Q   And you hadn't had any knee problems prior to

4  that May of 2016, had you?

5      A   No.

6      Q   And then the knee problems, it looks to me

7  like they kind of resolved by June of 2016; would that be

8  fair to say?

9      A   Yes.

10     Q   Okay.  So — And I just want to make sure.  It

11  will make the deposition a whole lot shorter if we get to

12  it, but — So really, we're only talking about a four to

13  six-week time period for this lawsuit; is that right?

14     A   Yes.

15     Q   Okay.  When you entered the department of —

16  the Illinois Department of Corrections as an adult, you

17  entered at the Northern Reception Center; is that right?

18     A   Yes.

19     Q   And that's at Stateville?

20     A   Yes, RC.

21     Q   And that would — Go ahead.

22     A   Yes.  Stateville RC.

23     Q   And that was on June the 10th of 2013?

24     A   Yes.

## Page 11

1      Q   When you got to the Northern Reception and

2  Classification Center, did you get a handbook, an inmate

3  handbook?

4      A   Yes.

5      Q   Do you still have that?

6      A   No.

7      Q   After you did your reception and

8  classification, you were then transported to Hill

9  Correctional Center; is that right?

10     A   Yes.

11     Q   And you were transported to Hill on July 16th

12  of 2013; is that right?

13     A   I believe so.

14     Q   And when you got to Hill, did you get an

15  inmate handbook?

16     A   Yes.

17     Q   And did that inmate handbook tell you how to

18  seek medical care?

19     A   Yes.

20     Q   It provided for the sick call process; is that

21  right?

22     A   Yes.

23     Q   Now, it doesn't lay out what the duties and

24  responsibilities of a nurse are, does it?

## Page 12

1      A   I'm not really sure, but I believe so.

2      Q   You think it does lay out the duties and

3  responsibilities?

4      A   Yeah.  I'm not sure, though.

5      Q   Okay.  Do you still have a copy of that inmate

6  handbook from Hill?

7      A   No.  No.

8      Q   What did you do with it?

9      A   Probably misplaced it.

10     Q   So at this point, you don't have any evidence

11  to establish what the duties and responsibilities of a

12  nurse are as far as patient treatment, do you?

13     A   As far as in IDOC?  In general?

14     Q   Well, at Hill Correctional Center.

15     A   Maybe.

16     Q   Okay.

17     A   I'm not sure.

18     Q   What do you have?

19     A   I don't know at this time right now.

20     Q   Okay.  So at this time you don't have

21  anything; would that be fair?

22     A   Yes.

23     Q   Okay.  And do you have anything that

24  establishes what the duties and responsibilities are of a

## Page 13

1    correctional officer or security staff?
2           A    Yes.
3           Q    What do you have?
4           A    I don't have anything, like, in black and
5    white, but I do have an orientation manual for -- for
6    Shawnee Correctional Center where I'm at now, and I believe
7    that would also apply to Hill Correctional Center because
8    they are the same security level.  So I have that.
9           Q    Can you send us a copy of that orientation
10   manual that you have from Shawnee?
11          A    Yes.
12          Q    And that would be the information and the
13   evidence that you would use in order to establish what the
14   duties and responsibilities are of correctional staff and
15   of medical staff?
16          A    Yes.
17          Q    Is there anything else that you have that
18   would -- that you would use to establish those duties and
19   responsibilities?
20          A    No.
21          Q    You said that you have some college education,
22   so I would like to go through what your education is and
23   where you got it.  Do you have a high school diploma or do
24   you have a GED?

## Page 14

1           A    GED.
2           Q    And where did you get your GED?
3           A    Juvenile Justice.
4           Q    That was at St. Charles?
5           A    IYC Joliet.
6           Q    Oh, Joliet.
7           A    Illinois Youth Center, Joliet.
8           Q    When did you get that GED?
9           A    2012.
10          Q    And then you said after that you had some
11   college; is that correct?
12          A    Yes.
13          Q    Where did you get your college from?
14          A    Lakeland College.
15          Q    And is that affiliated with a correctional
16   center?
17          A    Yes.
18          Q    Which one?
19          A    Hill and Shawnee.
20          Q    Do you have a -- do you have a degree from --
21   Lakeland is a community college; is that right?
22          A    I'm not sure what type of college it is, but I
23   don't have no degree.
24          Q    What things did you study?  What courses did

## Page 15

1    you take when you took college classes from Lakeland?
2           A    I have a certificate in custodial maintenance.
3    I took some part of a course in horticulture, and I took
4    classes in psychology -- academic classes in psychology and
5    anatomy.
6           Q    Anatomy?
7           A    Anatomy, yes.
8           Q    And when you say anatomy, was it human
9    anatomy?
10          A    Yes.
11          Q    And was it the skeletal and the muscle system
12   or was it organs or both?
13          A    All.
14          Q    You can read and write the English language?
15          A    Yes.
16          Q    Do you speak any other -- Do you speak and
17   write any other foreign languages?
18          A    No.
19          Q    Now, you told me that when you filed your
20   complaint that you didn't -- you did it yourself; is that
21   correct?
22          A    Yes.
23          Q    And you didn't --
24          A    Yes.

## Page 16

1           Q    You didn't have any help at all?
2           A    Some.  Some from a manual, like a law book,
3    and I feel like I got some help from God.
4           Q    All right.  But no humans helped you write
5    your complaint?
6           A    No.
7           Q    There weren't any law clerks or anything like
8    that who provided the form to you or told you what it is
9    that you were supposed to write on the form?
10          A    No.
11          Q    And they do have electronic filing at Hill,
12   don't they?
13          A    No.
14          Q    So you had to -- You had to mail in your
15   pleadings to the court?
16          A    Yes.
17          Q    And is that true at Shawnee as well?
18          A    I can't.  No electronic filing.
19          Q    I did forget to ask you, are you currently on
20   any medications?
21          A    No.
22          Q    You have taken some mental health medications
23   in the past; is that correct?
24          A    Yes.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                                    Fax: 314.644.1334

## Page 17

1    Q    And have you taken any mental health
2    medications while you have been at Shawnee?
3    A    Yes.
4    Q    When was the last time that you took
5    medication?
6    A    I'm not sure.
7    Q    Is there any reason why you won't be able to
8    remember the events that we're going to discuss today?
9    A    I should remember the events quite -- what's
10   the word -- I'll say vividly.
11   Q    There is no medication that you're currently
12   taking that would affect your memory; would that be fair?
13   A    Yes.
14   Q    Now, when you filed your complaint, did you
15   file it under oath?
16   A    Yes.
17   Q    And you wanted the court to rely upon the
18   allegations that you claimed in your complaint; is that
19   correct?
20   A    Not only the allegations, but also the
21   documents and medical records.
22   Q    Sure.  What I'm getting at is, the complaint
23   that you filed, you wanted the court to rely upon the
24   information contained in there; is that correct?

## Page 18

1    A    Yes.  That's true.
2    Q    And you wanted the parties to rely upon the
3    allegations that you made in your complaint; is that
4    correct?
5    A    Yes.
6    Q    And so your complaint as you pled it was
7    truthful; is that correct?
8    A    Yes.
9    Q    And you meant for the parties to rely upon
10   those allegations; is that correct?
11   A    Yes.
12   Q    Would you tell us what your conviction is for,
13   your current conviction?
14   A    Armed robbery.
15   Q    What sentence did you get?
16   A    21 years.
17   Q    What's your projected --
18   A    At 50 percent.
19   Q    I'm sorry?
20   A    21 years at 50 percent.
21   Q    And your conviction was in 2013?
22   A    Yes.
23   Q    What's your out date, your projected out date?
24   A    2022, June 6th.  No.  Excuse me.  I mean June

## Page 19

1    9th.
2    Q    Have you ever been employed?
3    A    No.  Are you talking about IDOC or in the
4    society?
5    Q    I was really asking about in society.  So
6    let's -- But let's divide it up into a couple of different
7    questions.  Have you ever been employed in society?
8    A    No.
9    Q    While you have been incarcerated -- Well, when
10   you were in juvenile detention, you can't have a job, can
11   you?
12   A    Yeah.
13   Q    Oh, you can?
14   A    Yes.
15   Q    Were you ever employed as a juvenile when you
16   were at the detention center?
17   A    Yes.
18   Q    What was your job at the detention center?
19   A    Dietary worker.
20   Q    And what kind of things did you do in dietary
21   at the youth center?
22   A    Handled food.
23   Q    So you served it or you cooked it?
24   A    I served it and I cleaned.

## Page 20

1    Q    How long were you a dietary worker?
2    A    Months.  Say some months.
3    Q    Were you ever let go from that position or was
4    your position terminated for any reason?
5    A    Transferred, so -- transferred to another
6    facility.
7    Q    Another juvenile detention facility?
8    A    Yes.
9    Q    Where were you transferred to?
10   A    To Kewanee.
11   Q    And when you transferred to Kewanee, did you
12   have a job?
13   A    No.
14   Q    And did you ask to be employed or did they
15   just not have a position for you?
16   A    They actually -- Actually, I helped clean,
17   like clean.  And also, I helped the teachers, the teachers
18   with the students because I already had my GED, so I just,
19   like, helped around.
20   Q    In the -- On the DOC side as an adult, you get
21   paid for a job; is that right?
22   A    Yes.
23   Q    Is that same -- Is that true when you are a
24   juvenile worker in a juvenile detention center?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                    Fax: 314.644.1334

## Page 21

1    A   Yes.

2    Q   How much did you get as a dietary worker?

3    A   It varies upon how much you work, but I think

4    it's -- you get like cents for how many hours you work.

5    Q   You get credit on your books to buy things

6    from the commissary; is that right?

7    A   Yes. Yes. Yes.

8    Q   And so when you were at Kewanee and you helped

9    clean and you helped the teachers, were you paid for that

10   or was that voluntary?

11   A   Actually, I believe -- Yeah, I believe it

12   was -- I actually did get paid for that. I did.

13   Q   Do you know what you got paid for that?

14   A   When I was cleaning, it was 15, $15 a month,

15   and basically like -- the other was like 29 cents. You get

16   paid -- it was 29 cents because of the hours that I put in.

17   Q   It was 29 cents an hour?

18   A   No. I think all together the time I put in,

19   it probably equaled to like 29 cents, so I only earned 29

20   cents of hours in that month.

21   Q   Are you saying 29 cents or a dollar and 29

22   cents?

23   A   29 cents. I think it's probably like three

24   cents an hour, or something like that. I'm not sure.

## Page 22

1    Q   And then you said that you helped teachers in

2    the school when you were at the IYC; is that correct?

3    A   Yes.

4    Q   Did you get paid for that or was that

5    voluntary?

6    A   That's the 29 cent, I believe, I was telling

7    you about.

8    Q   Oh, okay. What types of things did you do to

9    help the teachers?

10   A   I tried to share my knowledge of how I come

11   about certain answers in math and stuff like that. I

12   helped -- I helped students that don't have their GED work

13   towards their GED or high school diploma.

14   Q   In any particular area?

15   A   Math.

16   Q   And were you doing basic arithmetic?

17   A   I don't know what that is.

18   Q   Adding and subtracting and multiplying and

19   dividing.

20   A   Yes.

21   Q   Were you doing algebra, solving for X?

22   A   Yes.

23   Q   Did you solve for X and Y or just for X?

24   A   I'm not sure. I just did what -- the best I

## Page 23

1    could.

2    Q   Okay. So I'm still a little confused about

3    Joliet versus Kewanee. At Joliet, you said that you worked

4    in dietary and --

5    A   Yeah.

6    Q   -- were you getting $15 an hour for working in

7    the dietary there?

8    A   No, not $15 an hour.

9    Q   I'm sorry. $15 a month?

10   A   It depends how much you work. I think some

11   jobs, I think it's like three cents an hour or something.

12   It depends how many hours you put in to get a monthly

13   salary.

14   Q   Okay. But when you were at Kewanee, you were

15   getting $15 an hour to do cleaning?

16   A   No, not $15 an hour. $15 a month.

17   Q   Yeah, that's what I meant. I'm sorry. $15 a

18   month. Okay. So now let's go on to the Department of

19   Corrections. When you were at Hill, did you have any jobs?

20   A   No.

21   Q   And let's see. It looks like you transferred

22   from Hill to Vienna on March 15th of 2017; is that correct?

23   A   Yes.

24   Q   And did you have any jobs at Vienna?

## Page 24

1    A   Yes.

2    Q   What jobs did you have at Vienna?

3    A   Janitor and dietary worker.

4    Q   Were those two different jobs at two different

5    times?

6    A   Yes.

7    Q   Were you ever asked to leave one of the jobs

8    or were you not allowed to continue any of those jobs?

9    A   You can't work two jobs at once, so I had to

10   leave my -- leave my janitor job to work in the dietary.

11   Q   And was the dietary job a higher paying job

12   than the janitor job?

13   A   The same pay. I believe the same pay.

14   Q   Is that $15 a month?

15   A   I believe so. I think so.

16   Q   Is the dietary job a better job than the

17   janitor job?

18   A   The benefits vary.

19   Q   Is there some reason why you transferred from

20   dietary -- I'm sorry -- from janitor to dietary?

21   A   In Vienna Correctional Center, they randomly

22   choose people who qualify to work in the dietary.

23   Q   So did they come to you and choose you or is

24   it something that you said that you would be interested in

## Page 25

1  doing?
2      A   I got randomly selected.
3      Q   And when you were randomly selected to do
4  dietary, then you quit your janitor job?
5      A   Yeah.  Yeah.  That's automatically -- they
6  automatically get determined.
7      Q   Were you ever asked to leave the dietary job?
8      A   Yes.
9      Q   Why?
10     A   Because I had some cookies in my pocket and
11 you're not supposed to bring anything back from the
12 dietary.
13     Q   And how long had you been in the dietary unit
14 when you got caught with the cookies in your pocket?
15     A   Maybe two months.
16     Q   After that, did you have a job at Vienna?
17     A   No.
18     Q   How long were you unassigned?
19     A   Probably two months.
20     Q   And then you got transferred to Shawnee?
21     A   Yes.
22     Q   How long did you work in the janitor job?
23     A   Maybe a month.
24     Q   And you worked in the dietary job then for

## Page 26

1  about a month?
2      A   Maybe two.
3      Q   And then you have been at Shawnee ever since?
4      A   Yes.
5      Q   And I'm sorry.  You transferred to Shawnee on
6  August 2nd of 2017?
7      A   I'm not exactly sure, but somewhere around
8  that time.
9      Q   Since you have been at Shawnee, have you had
10 any employment?
11     A   Yes.
12     Q   Where and what?
13     A   Just probably a month, a little bit over a
14 month ago, janitor.
15     Q   And what's your state pay?
16     A   $15.
17     Q   A month?
18     A   Yes.
19     Q   Is a janitor position the same as a porter?
20     A   Yes.
21     Q   So tell me what it is that a janitor or a
22 porter does at -- well, is it similar at Shawnee -- Let me
23 go back.  Is the janitor job at Shawnee similar to the
24 janitor job that you did at Hill?

## Page 27

1      A   I never had a job at Hill.
2      Q   I'm sorry.  You're right.  I apologize.  Tell
3  me what -- You were a janitor for a month at Vienna; right?
4      A   Yes.
5      Q   And is the job at Vienna, the janitor job at
6  Vienna similar to the janitor job at Shawnee?
7      A   I would believe so because the duty is to
8  clean and disinfect, but since I've been here in Shawnee, I
9  haven't worked my assignment.
10     Q   Are you capable of working your assignment?
11     A   Yes.
12     Q   They just don't have work for you yet; is that
13 right?
14     A   It's up to the facility description to -- who
15 they choose to let to work.
16     Q   And so far they haven't had you work?
17     A   They said they don't have -- they don't need
18 me right now.
19     Q   Okay.  Now, I think we determined earlier, but
20 I just want to verify so that we can limit the time frame
21 that we're talking about.  Your complaint deals with the
22 time frame of approximately May the 29th of 2016 to June
23 the 3rd of 2016; is that correct?
24     A   I believe.  I believe -- Until when?

## Page 28

1      Q   May the 29th of 2016 to June the 3rd of 2016?
2      A   I think it occurred around May 29th, and I
3  think the infection went away sometime about two months
4  later, like between -- so it was about from four to eight
5  weeks.
6      Q   Okay.  So if I understand -- Well, I want to
7  make sure that I understand correctly.  You had some kind
8  of a bump or a boil or something on your left knee; is that
9  correct?
10     A   Yes.
11     Q   And that was in May of 2000 -- the end of May
12 of 2016?
13     A   Yes.
14     Q   And you popped it; is that right?
15     A   Yes.
16     Q   And you made a request to go to the healthcare
17 unit; is that right?
18     A   Yes.
19     Q   And the request that you made was on May the
20 29th of 2016; is that right?
21     A   Yes.
22     Q   Did you put in for sick call?
23     A   Yes.
24     Q   Tell me what the process is for asking for

## Page 29

1  sick call.
2      A   It's writing a request, either handwritten and
3  informing your issue, and you will be called by the
4  healthcare unit to be evaluated.
5      Q   Well, when you -- Mr. Harris, are you looking
6  at something?
7      A   Yes.
8      Q   What are you looking at?
9      A   The actual medical records to make sure what
10  I'm saying is accurate.
11      Q   Okay.  That's fine.  Just want to make sure
12  that we understand what you're looking at.
13      A   Yes.
14      Q   So when you -- And you were looking at it for
15  the date; is that right?
16      A   Yes.
17      Q   Okay.  So I want to talk about the process
18  first.  You make a request, a written request.  Does it
19  have to be in writing?
20      A   Yes.
21      Q   Okay.  What if you can't talk?  Can you tell
22  somebody that -- I'm sorry.  If you can't write, can you
23  tell somebody that you need healthcare?
24      A   Yeah.

## Page 30

1      Q   Okay.  So you make a written request and do
2  you hand that to security staff?
3      A   No.  It's a mailbox you put it in or you can
4  directly give it to a nurse.
5      Q   The nurses come around to your housing unit?
6      A   Yes.
7      Q   Do they come around twice a day?
8      A   Yes.
9      Q   Once in the morning and once in the evening?
10      A   Yes.
11      Q   And when you give either give the nurse the
12  request slip or you put it in the box, you're signed up for
13  sick call; is that right?
14      A   Yes.
15      Q   And when you get signed up for sick call,
16  you're initially evaluated by a nurse; is that right?
17      A   Yes.
18      Q   Do they do that in the housing unit or do they
19  do that in the healthcare unit?
20      A   If it's an emergency, they'll examine it in
21  the housing unit, but non-emergency, they will -- you will
22  be called over.
23      Q   So your name gets put on a list, and then at
24  the appropriate time, you walk over to the healthcare unit

## Page 31

1  and you're evaluated initially by a nurse; is that right?
2      A   Yes.
3      Q   Do they do housing units, one housing unit in
4  the morning of one day and then in the afternoon of another
5  day?
6      A   That I couldn't tell you, but my thought on
7  that would be just a schedule they were on according to the
8  facility's discretion.
9      Q   If you don't know, it's fine to say that you
10  don't know, and that's fair.  So when you were called over
11  to the healthcare unit, was that on May the 29th?
12      A   Yes.
13      Q   And do you remember who you saw that day?
14      A   I don't remember exactly who I saw that day.
15      Q   Okay.  It wasn't Nurse Roxanne Hawk, was it?
16      A   I don't believe so.
17      Q   The name that I have is Crystal Harrison; does
18  that seem about right?
19      A   Yes.
20      Q   And she evaluated you for the pain in your
21  left knee; is that right?
22      A   Yes.
23      Q   And she did not refer you to see the doctor on
24  that day, did she?

## Page 32

1      A   No.
2      Q   And she gave you Ibuprofen; is that right?
3      A   Yes.
4      Q   And she also told you to apply ice to your
5  knee; is that right?
6      A   Yes.
7      Q   And then she also had you placed in the
8  infirmary just for observation; is that right?
9      A   Yes.
10      Q   And that was at approximately 5:20 p.m. on May
11  the 9th of 2016?
12      A   I -- Yeah, it was that day.
13      Q   Do you have your medical records in front of
14  you?
15      A   Yes.
16      Q   And do you see the record which is labeled as
17  May the 29th of 2016?
18      A   Yeah, I see the file.
19      Q   Do you have any reason to dispute that that
20  was the time?
21      A   At that time they were observing it, so I
22  don't know what time I actually entered the infirmary, but
23  this is the time I was being examined.
24      Q   And you have a copy of your medical progress

8 (Pages 29 to 32)

## Page 33

1  notes; is that right?
2      A   Yes.
3      Q   And you attached them to your complaint;
4  correct?
5      A   Yes.
6      Q   And there's nothing in those medical notes
7  that you claim is inaccurate, is there?
8      A   No, not that -- No, I don't believe. I
9  believe it's pretty accurate.
10      Q   Okay.  So then you were placed in the
11  healthcare unit for observation; right?
12      A   Yes.
13      Q   And you were assessed again at 11:10 p.m. on
14  May the 29th; is that correct?
15      A   What did you say?
16      Q   You were assessed again while you were being
17  observed and you were staying in the infirmary, you were
18  assessed again at approximately 11:10 p.m. on May the 29th?
19      A   Yes.
20      Q   You were able to sit on the side of the bed;
21  is that right?
22      A   Yes.
23      Q   They took your temperature; right?
24      A   Yes.

## Page 34

1      Q   And they took some of your other vital signs;
2  is that right?
3      A   Yep.
4      Q   And at that time you were not in acute
5  distress, were you?
6      A   Yeah.  Yes, I was in pain.
7      Q   The medical record notes that there was no
8  acute distress noted with movement of your left knee.  Do
9  you see that?
10      A   Acute distress?  I don't know the definition
11  of that.
12      Q   Would you agree with me that it does say no
13  acute distress, NAD?
14      A   Can you --
15      Q   Sure.  We can go through it.  It says on
16  the -- starting on the second line -- Well, it says S/O,
17  which is subjective/objective, and then it says I/M, which
18  means inmate.  Inmate sat on side of bed for assessment.
19  Vital signs; 120/80, 96.7 degrees, which is your
20  temperature; 54, which is your heart rate; 12, which is
21  your respiration; your -- and then it says 98 percent.  I
22  suppose that that's probably an oxygen rate.  And then it
23  says A and O times three, which is alert and oriented times
24  three.  Skin W/D.  MAEW.  Respiration even, non-labored.

## Page 35

1  Are you with me so far?
2      A   Yes.
3      Q   And would you agree that those are all the
4  things that that says?
5      A   Yes.
6      Q   Okay.  And then it says cap refill brisk.  Do
7  you see that?
8      A   Yes.
9      Q   And I read that accurately, didn't I?
10      A   Yes.
11      Q   And then it says NAD?
12      A   Yeah, NAD.
13      Q   Okay.  And do you understand that that stands
14  for no acute distress?
15      A   Okay.  Yeah, now I see.
16      Q   Okay.  No acute distress noted with movement
17  of left knee.  Do you see that?
18      A   Yes.
19      Q   And then it says bandage to left knee is C/O
20  or D slash I.  Do you see that?
21      A   Yes.
22      Q   Do you know what that means?
23      A   No.
24      Q   Inmate reports pain to left knee to be eight

## Page 36

1  of 10.  Do you see that?
2      A   Yes.
3      Q   Those notes are all correct?
4      A   Yes.  Well, excuse me.  The NAD, I say those
5  aren't correct.  You quoted them specifically.  Now, the
6  NAD, no acute distress, I don't know what that means.
7      Q   That's fine.  And the nurse can explain what
8  that means.
9      A   Okay.
10      Q   And then you got ibuprofen; is that right?
11      A   Yes.
12      Q   And then you also refused an offer of more ice
13  for your knee; is that right?
14      A   Yes, because I was explaining to her that it
15  was infected and I don't believe that I needed any ice.
16      Q   Now, that nurse that evaluated you was not
17  Roxanne Hawk, was it?
18      A   No.
19      Q   And then the next day at approximately
20  9:00 a.m., you were still in the infirmary; is that right?
21      A   Yes.
22      Q   And you were seen by another nurse that was
23  not Roxanne Hawk; is that correct?
24      A   Yes.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                    Fax: 314.644.1334

## Page 37

1    Q    And that was Leola Parish; correct?
2    A    I'm not sure.  I can't really read the
3    handwriting.
4    Q    Okay.  Do you have any --
5    A    But it wasn't Roxanne.
6    Q    Okay.  And you don't have anything to dispute
7    that it was Leola Parish, do you?
8    A    No.
9    Q    And then let's go back to that other page.  If
10   I told you that the nurse was Julie Mackey, you don't have
11   anything to dispute that the nurse who saw you at
12   11:10 p.m. on May the 29th was Julie Mackey, do you?
13   A    No.
14   Q    So Leola Parish, or whoever the nurse was,
15   that saw you at 9:00 a.m. on May the 30th indicated that
16   you were resting; is that right?
17   A    Yeah.
18   Q    And you told Nurse Parish that you thought
19   your left knee was infected?
20   A    Yes.
21   Q    And she writes, no opening in skin, no
22   drainage, not hot to touch; is that right?
23   A    Yes.
24   Q    And she took your vital signs?

## Page 38

1    A    Yes.
2    Q    And she watched you walk; is that right?
3    A    That, I can't recall.
4    Q    Do you have anything to dispute that she
5    watched you walk?
6    A    Does it say she watched me walk?
7    Q    Well, it says gait steady.
8    A    Well, I would say she didn't watch me walk.
9    Q    She accurately reported that you had pain; is
10   that right?
11   A    Where does it say that?
12   Q    Reports pain nine.  "It helps when I take
13   four."
14   A    Oh, yeah.  She's talking about the ibuprofen.
15   Yeah, it helped the pain when I took four of them.
16   Q    So was there anything in that note then that
17   is inaccurately reported?
18   A    No.
19   Q    All right.  And she gave you Motrin; is that
20   right?
21   A    Yes.
22   Q    And you were supposed to take it twice a day
23   for five days?
24   A    I believe so.

## Page 39

1    Q    And she told you that you were going to be
2    discharged from the healthcare unit infirmary; correct?
3    A    Yes.
4    Q    And she told you that if you got a boil again,
5    not to pop it; right?
6    A    Yeah.
7    Q    And you told her that you understood; is that
8    right?
9    A    Yeah.
10   Q    Okay.  So that note is correct, would that be
11   right?
12   A    Where -- well, like I -- Well, I consider that
13   to be true.
14   Q    Okay.  And I can point you to the note.  It
15   says -- If you look on the second column, the third line up
16   from the bottom of writing.
17   A    Yeah.
18   Q    "Advised if any issue.  Discussed signs or
19   symptoms of infection to report to healthcare unit/nurse
20   sick call.  Do not pop.  States understanding."
21   A    Okay.  Yes, I see that.
22   Q    Okay.  So the note that Nurse Parish wrote on
23   May the 30th of 2016 would be true and accurate; is that
24   right?

## Page 40

1    A    Yes.
2    Q    And then you saw another nurse on May the 30th
3    of 2016 at approximately 12:45 p.m.; is that correct?
4    A    Yes.
5    Q    And she gave you more Motrin; is that right?
6    A    I'm not exactly sure.
7    Q    Well, it says that you have Motrin; is that
8    right?
9    A    Yeah.
10   Q    And you made another complaint that you were
11   in pain; is that right?
12   A    Yes.
13   Q    So she placed you in the infirmary again?
14   A    Yep.
15   Q    Is there anything -- You have the note of May
16   the 30th of 2016 in front of you at approximately 12:45?
17   A    Yep.
18   Q    And --
19   A    Yes.
20   Q    Is there anything in that note that you think
21   is incorrect?
22   A    No.
23   Q    And then you stayed in the infirmary
24   overnight; is that right?

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 41

1   A   Yes.

2   Q   So you were seen at approximately 11:15 p.m.

3   on May the 30th?

4   A   Yes.

5   Q   And you were seen by a nurse who was not

6   Roxanne Hawk; is that correct?

7   A   Yes.

8   Q   And if I tell you that the nurse that you saw

9   is Julie Mackey, do you have any reason to believe that

10  that's not who you saw on May the 30th of 2016 at

11  11:15 p.m.?

12  A   Yeah, I assume that that would be her.

13  Q   Your vital signs were taken?

14  A   Yep.

15  Q   She checked out your knee; is that correct?

16  A   Yes.

17  Q   And do you have that note in front of you?

18  A   Yes.

19  Q   It says that you reported a pain to be nine of

20  10; is that correct?

21  A   Yes.

22  Q   Is there anything in that note on May the 30th

23  of 2016 at 11:15 made by Julie Mackey that is incorrect?

24  A   I believe the note of swelling to be

## Page 42

1   incorrect.

2   Q   Anything else?

3   A   No.

4   Q   You were given ibuprofen?

5   A   Yes.

6   Q   And then you were seen the following morning

7   at approximately 4:30 a.m. on May the 30th of 2016 by

8   another nurse; is that correct?  I'm sorry, by Dr. Sood; is

9   that correct?

10  A   Yes.

11  Q   Tell me what Dr. Sood did.

12  A   Dr. Sood confirmed what the nurses -- what I

13  was -- what I was alleging, that my knee was infected. And

14  they were just saying it was just swollen, and all they

15  kept giving me was ibuprofen and ice. And when Dr. Sood

16  examined my knee, he confirmed that it was actually

17  infected, and he prescribed me very strong antibiotics and

18  800 milligrams ibuprofen.

19  Q   Okay. And how do you know that Bactrim is a

20  very strong antibiotic?

21  A   Because of the milligram, I consider it

22  stronger than a normal.

23  Q   Dr. Sood didn't tell you that it was a very

24  strong antibiotic, did he?

## Page 43

1   A   No.

2   Q   And did that antibiotic clear up your

3   symptoms?

4   A   Yes.

5   Q   And then you were discharged back to your cell

6   house at approximately 9:15 or 9:00 o'clock a.m. on May the

7   31st of 2016 after you saw Dr. Sood?

8   A   Yes.

9   Q   And you didn't return to the healthcare unit

10  for your knee after May 31st of 2016, did you?

11  A   No, I don't believe so.  Not that day.

12  Q   Did you return, ever?

13  A   Yes.

14  Q   Okay.  When did you return?

15  A   On June 1st.

16  Q   And is that when you saw Roxanne Hawk?

17  A   Yes.

18  Q   And that was at 6:54 p.m.?

19  A   Yes.

20  Q   Now, you weren't over at the healthcare unit

21  on June 1st of 2016 when you encountered Roxanne Hawk, were

22  you?

23  A   When I first encountered Roxanne Hawk, it was

24  before 6:50.  I believe it was before 6:50.

## Page 44

1   Q   And that was in your housing unit; is that

2   right?

3   A   No.  Actually it was at 6:54.  Excuse me.  It

4   was at 6:54 p.m.

5   Q   Okay.  And was that in the housing unit or was

6   that in the healthcare unit?

7   A   I believe that was -- I believe that was in

8   the housing unit.

9   Q   So I just want to go through the chronology of

10  events.  On June the 1st in the evening, you told a -- you

11  told security staff that your knee was hurting; is that

12  correct?

13  A   No.  That was one of the issues, but -- Yeah,

14  that was one of the issues.  One of them.

15  Q   The nurse wasn't over at the housing unit when

16  you made this complaint, was she, initially?

17  A   No.  No.

18  Q   And an emergency was called; is that right?

19  You asked for an emergency to be called?

20  A   Yes.

21  Q   And after the emergency was called, Nurse Hawk

22  came over to your housing unit; is that correct?

23  A   Yes.

24  Q   And is that the first encounter that you had

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

SIDNEY HARRIS  5/22/2019

## Page 45

1  had with Nurse Hawk over your knee?
2      A   I believe so, yes.
3      Q   Were you in your cell at the time or were you
4  someplace else?
5      A   I was on the dayroom table, laying down on the
6  table.
7      Q   And what had you been doing just prior to
8  being on the table in the dayroom?
9      A   Laying down in the bed.
10     Q   So you had been laying down in bed and then
11 you came out to the dayroom; is that right?
12     A   Yes.
13     Q   Okay.  Were there other inmates in the
14 dayroom?
15     A   Yes.
16     Q   What were you doing?
17     A   When I came out from dayroom?
18     Q   Yes.
19     A   I sensed that I was dizzy, and I was limping.
20 I couldn't walk.  And so I laid on the table, and I told
21 some of the other inmates to get the officer, that I'm
22 dizzy and I can't walk.
23     Q   Okay.  And did anyone come?
24     A   Yes.

## Page 46

1      Q   Who was it?
2      A   It was -- I don't know the initial officer who
3  called it, but I know Lieutenant Jones came and Nurse Hawk
4  came.
5      Q   How long did it take Lieutenant Jones to come?
6      A   Probably ten minutes.
7      Q   And did Nurse Hawk come before Lieutenant
8  Jones?
9      A   Maybe.  Maybe around the same time.
10     Q   And tell me then what happened.
11     A   They asked me what was wrong with me, and I
12 told them I was real dizzy and that my knee is swelling and
13 infected and I can't walk.
14     Q   Did anyone -- Did anyone ever tell you that
15 your dizziness was caused by your knee?
16     A   No.
17     Q   Okay.  So tell me what happened then after you
18 told the nurse and Lieutenant Jones what the problem was.
19     A   I informed Lieutenant Jones and also Nurse
20 Hawk that I was dizzy -- I had an infected knee, I was
21 dizzy and I couldn't walk.  And they said try to get up and
22 walk, and I leaned up and I'm like, I'm dizzy.  I don't
23 think I can walk.  And then Lieutenant Jones said, we're
24 not going to carry you.

## Page 47

1      Q   And do you know why --
2      A   And then --
3      Q   Do you know why he couldn't carry you?
4      A   I was going to get there.
5      Q   Okay.
6      A   He said we are not going to carry you, and
7  Roseann (sic) Hawk was like, I think he's faking because
8  he's been in healthcare a few times this week for the same
9  incident.  And so they kept telling me to get up, try to
10 walk, and I told them I can't, I'm very dizzy.  And they
11 actually brought in the stretcher board, and they had some
12 inmates to carry me to the -- to the -- What's that called?
13 To the ambulance and --
14     Q   The ambulance is kind of like a golf cart, a
15 big long golf cart?
16     A   Yeah.  Yes.  Yes.  It's basically like a --
17 with a huge back to it.
18     Q   Okay.  And the golf cart takes you from the
19 cell -- from the outside of the cell house to the outside
20 of the healthcare unit?
21     A   Yes.
22     Q   And you're on a backboard; is that right?
23     A   Yes.
24     Q   So the lieutenant and the nurse had you placed

## Page 48

1  on a backboard in the housing unit; is that correct?
2      A   Yes.
3      Q   And then you were carried out to the ambulance
4  golf cart; is that right?
5      A   Yes.
6      Q   You didn't have to walk; right?
7      A   Yes.
8      Q   I'm correct that you did not have to walk?
9      A   Yes.
10     Q   And then -- Sometimes I ask a bad question, so
11 I have to just go back a little bit.
12     A   That wasn't a bad question.
13     Q   And so then you were transported on the golf
14 cart ambulance between the healthcare -- I'm sorry, between
15 the housing unit and the healthcare unit; is that correct?
16     A   Yes.
17     Q   And you didn't have to walk; is that correct?
18     A   Yeah.  I was placed in the wheelchair.
19     Q   Well, you were transported on the golf cart
20 between the housing unit and the healthcare unit; right?
21     A   Yes.
22     Q   And then when you got to the healthcare unit,
23 on the outside of the healthcare unit, you were transferred
24 from the backboard to a wheelchair; is that correct?

12 (Pages 45 to 48)

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                          Fax: 314.644.1334

## Page 49

1  A  Yes.

2  Q  And you didn't have to walk; is that correct?

3  A  Yes.

4  Q  And then you were wheeled in from the
5  wheelchair to the healthcare unit where you were assessed;
6  is that correct?

7  A  Yes.

8  Q  All right.  So was there anything about the
9  transportation that you wanted to -- you wanted to tell me
10  a little bit more about or -- because I know that I kind of
11  interrupted you, and I'm not sure that you got to finish
12  your answer.  So if there's anything else that you want to
13  say about that.

14  A  Yeah.  From the housing unit to the transport,
15  I was saying that Lieutenant Jones and Roseann Hawk showed
16  deliberate indifference for a serious medical need by
17  saying I was faking it and not doing their job to assist me
18  to the van and having untrained inmates to do it -- do
19  that.

20  Q  And have you finished your answer?

21  A  Yes.

22  Q  Okay.  So I just want to make sure that I
23  understand what your claim is.  Your claim is that because
24  Roxanne Hart and Lieutenant -- or Hawk and Lieutenant Jones

## Page 50

1  weren't the ones to carry you from the table in the
2  health -- in the housing unit to the golf cart ambulance,
3  that you think that that's deliberate indifference?

4  A  No.  The overall -- The overall performance of
5  Hawk and Lieutenant Jones, overall performance from that
6  not helping me to the -- doing their job themselves to the
7  ambulance truck and also the -- with everything that
8  happened afterwards after that was the deliberate
9  indifference to a serious medical need.

10  Q  All right.  So we're going to -- I need to
11  kind of parse this out so that I understand what it is that
12  you're claiming.  All right?  And so we're going to have to
13  get into some of the detail.  All right?

14  A  Yes.

15  Q  So you're not claiming then that the failure
16  to -- the failure -- let me ask it in a positive way.  Are
17  you claiming that because Roxanne Hawk and Lieutenant Jones
18  did not carry you from the table in the dayroom to the
19  ambulance golf cart outside the housing unit, that that was
20  deliberate indifference?

21  A  Yes, because their reason of not carrying me
22  was because they said I was faking, and that was the reason
23  of them not carrying me and have other people do it because
24  they said that I was faking.  Lieutenant Jones simply said,

## Page 51

1  I'm not carrying you because I think he's faking.  And
2  Lieutenant Hawk (sic) also said -- was the one to first
3  imply it to them that she thinks I'm faking because I have
4  been here at the healthcare a few too many times
5  consecutive about that same incident.

6  Q  Roxanne Hawk and Lieutenant Jones did have you
7  transported to the healthcare unit; is that correct?

8  A  Yes.

9  Q  And there was no delay in having you
10  transported, was there?

11  A  Sort of.

12  Q  Well, it was done within a matter of minutes,
13  wasn't it?

14  A  Yes.  Yeah, it took about a half hour.

15  Q  And the inmates assisted in getting you to --
16  from the table to the ambulance; is that correct?

17  A  Yes.

18  Q  And you were already on an antibiotic at that
19  point; is that correct?

20  A  Yes.

21  Q  And then once you got into -- Well, once you
22  got to the healthcare unit, you were immediately taken from
23  the ambulance and put into a wheelchair; is that correct?

24  A  Yes.

## Page 52

1  Q  And then were you seen in the healthcare unit
2  while you were in the wheelchair?

3  A  Yes, I was being screened or -- yeah, by Nurse
4  Hawk.  She was filling out the paperwork for the medical
5  records, which is on Exhibit B, the other complaint.

6  Q  Okay.  And that's the note from June 1, 2016,
7  at approximately 6:54 p.m.?

8  A  Yes.

9  Q  What -- Who were you seen by in the healthcare
10  unit on June the 1st of 2016?

11  A  As far as medical staff?

12  Q  Correct.

13  A  Nurse Hawk.

14  Q  And Nurse Hawk gave you water; is that right?

15  A  Yes.  Nurse Roseann Hawk, yeah, she gave me
16  two big pitchers of water.

17  Q  And you were able to drink one; correct?

18  A  Yeah, I actually drunk one, and I needed to
19  take a break from drinking, but I ultimately ended up
20  drinking the second one, too.

21  Q  Okay.  You were able to complete drinking the
22  second one?

23  A  Yes.

24  Q  Did that make you feel any better?

## Page 53

1      A   No, it didn't.
2      Q   You didn't stay in the infirmary overnight on
3 June the 1st of 2016, did you?
4      A   No.
5      Q   And once you drank those two pitchers of
6 water, you didn't have any more contact with Roxanne Hawk,
7 did you?
8.      A   Yes.
9      Q   Okay.  What contact did you have with her?
10      A   It was the same.  Can you explain contact,
11 like what you mean by that?
12      Q   Sure.  When you got to the healthcare unit,
13 you went to a room where they -- where Roxanne Hawk
14 evaluated you; correct?
15      A   Yeah.
16      Q   And in her evaluation, she took your vital
17 signs; right?
18      A   Yes.
19      Q   She looked at your knee; correct?
20      A   Yes.
21      Q   She shined a light in your eyes?
22      A   Maybe.
23      Q   You don't have anything to refute that, do
24 you?

## Page 54

1      A   I actually don't remember her shining no
2 lights in my eyes.
3      Q   Well, do you see where it says pupillary
4 reaction, PERRLA?  Fourth line on the left-hand side.
5      A   Is it on the same paper?
6      Q   It is.
7      A   About the inmate drank two pitchers of water?
8      Q   Yes.
9      A   Okay.  You say --
10      Q   So I'll go with you and show you where it is.
11 Do you see on the top of the page where it says O?
12      A   Yes.
13      Q   And then it says lying?
14      A   Yes.
15      Q   And then it says standing?
16      A   Yes.
17      Q   Do you have anything to refute any of the
18 numbers that Roxanne Hawk put on that -- on that paper?
19      A   I don't.  I'm not a medical specialist.  I
20 really don't know what the numbers mean.
21      Q   Okay.  You don't have anything to say that
22 those aren't accurate, do you?
23      A   No, I don't.
24      Q   And then the next line says pupillary

## Page 55

1 reaction.  Do you see that?
2      A   Yes.
3      Q   And then it says PERRLA.
4      A   Right.
5      Q   Do you have any reason to dispute that that
6 test was done on you and what the result was?
7      A   No.
8      Q   And then it talks about handgrips; correct?
9      A   Yes.
10      Q   And "yes" is circled?
11      A   Yes.
12      Q   Do you have any reason to refute that?
13      A   No.
14      Q   You didn't attempt to walk, did you?
15      A   No.
16      Q   She checked your ears; is that right?
17      A   Yeah.  Maybe.
18      Q   And do you have any reason to refute that what
19 she circled was incorrect?
20      A   No.
21      Q   Is there anything else on the entries for June
22 the 1st of 2016 that you claim is inaccurately written by
23 Roxanne Hawk?
24      A   No.  Correct.

## Page 56

1      Q   And after you drank those two pitchers of
2 water --
3      A   Yeah.
4      Q   -- then did Roxanne Hawk turn you over to the
5 custody of security staff?
6      A   What she actually did was she informed the
7 sarge -- the sergeant that I was ready and able to go back
8 to the unit, and so I was told by the sergeant, Lieutenant
9 Jones, to get up and walk back to the unit.  And as it
10 clearly shows on Exhibit B, the paper I was just looking
11 at, that I'm saying I can't, that I couldn't walk and that
12 I was dizzy and -- but she still -- she still was -- She
13 gave them the okay and permitted them that I was able to
14 walk back to the unit.  So what they did was gave me three
15 direct orders to go back to my housing unit, and I stated
16 to Lieutenant Jones that I couldn't walk.  And by Roseann
17 Hawk having -- by having information and her seeing the
18 boil on my left knee and that I'm taking I believe it was
19 800 milligrams of antibiotics, and that I was dizzy and
20 that I couldn't walk because of the boil, and by her
21 informing Lieutenant Jones that I'm able to walk back to my
22 unit, that was showing deliberate indifference to a serious
23 medical need.  And by me also telling Lieutenant Jones that
24 I am dizzy, I cannot walk and because I have this boil on

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 57

1   my knee, and he seen it, too, and I was in a wheelchair at
2   this time.  They wheelchaired (sic) me into segregation,
3   rolled me in a wheelchair to segregation.
4       Q.  Okay.  Roxanne Hawk didn't do that, did she?
5   She didn't wheelchair -- or she didn't roll the wheelchair
6   to you?
7       A.  No, Lieutenant Jones did.
8       Q.  Okay.  So when she finished with you, when she
9   said you're ready to go back to your unit, you didn't have
10  any further contact with Roxanne Hawk, did you?
11      A.  I believe not.
12      Q.  When -- After you drank those two pitchers of
13  water, did you ever attempt to get up and walk?
14      A.  Yes.
15      Q.  Okay.  Did you fall?
16      A.  No, because I had a chair.  I attempted to
17  stand, so -- I wasn't able to, so I sat back down in the
18  chair.
19      Q.  And was anyone else present when you tried
20  that?
21      A.  Yes.  Lieutenant Jones.
22      Q.  But Roxanne Hawk was not present when you
23  tried that?
24      A.  No.

## Page 58

1       Q.  After -- Well, Roxanne Hawk did not provide
2   you with any additional medication other than what Dr. Sood
3   had prescribed to you the day before; would that be
4   correct?
5       A.  I believe that would be correct.
6       Q.  And after you saw Roxanne Hawk, you weren't
7   prescribed any additional medication by anyone for your
8   knee, were you?
9       A.  I believe that to be -- No, I wasn't.  I
10  believe I wasn't prescribed any further medication.
11      Q.  And you didn't have any other injuries after
12  you saw Roxanne Hawk in the infirmary -- I'm sorry, in the
13  healthcare unit on June the 1st of 2016, did you?
14      A.  No serious injuries.
15      Q.  Did you have any injuries at all as a result
16  of your knee?
17      A.  No.  No.
18      Q.  You have never been designated as being
19  seriously mentally ill, have you?
20      A.  No, not during this time period.
21      Q.  And you did not take any medications
22  because -- any mental health medications because of the
23  claims that you have about your -- the boil on your knee,
24  have you?

## Page 59

1       A.  No.
2       Q.  And you have never spoken with a mental health
3   professional as a result of the boil on your knee or the
4   encounters that you had with Roxanne Hawk or any of the
5   security staff, have you?
6       A.  I believe -- I believe -- I don't believe so.
7       Q.  You did talk to a counselor about a grievance
8   that you wrote; would that be correct?
9       A.  Concerning what?
10      Q.  You wrote a grievance about the incident on
11  June the 1st?
12      A.  Yes.  Yes, I did.
13      Q.  And you talked to a counselor or the counselor
14  wrote something about responding to your grievance; is that
15  right?
16      A.  Yes.
17      Q.  But you didn't talk to the counselor about any
18  problems that you were having with -- or as a result of the
19  incident on June the 1st, did you?
20      A.  I didn't verbally talk to him, but I explained
21  all of my allegations and sufferings and all of that in the
22  grievance.
23      Q.  The counselor didn't provide any mental health
24  counseling for you as a result of that, did he?

## Page 60

1       A.  I don't believe so, no.
2       Q.  Have I -- I have another area of inquiry that
3   I want to ask you about, and then the AAG is going to ask
4   you some questions.  But have I given you a full and fair
5   opportunity to explain what your claims are against Roxanne
6   Hawk and about the incident that occurred between the two
7   of you?
8       A.  I'm fully satisfied with the answers I gave,
9   and I am -- I believe I fully expressed my claim concerning
10  Roseann Hawk.
11      Q.  Okay.  So the other area of inquiry that I
12  want to ask you about is your damages.  In your complaint,
13  you've asked for $250,000 in damages, and what I want to
14  know is, how is it that you came up with that amount?
15      A.  I came up with that amount because of the pain
16  and suffering I endured, and the cruel and unusual
17  punishment, and being subjected to conditions of
18  confinement.  The pain, the overall experience from me
19  having an infection and being mistreated, as far as like
20  the ice and not -- You know what I'm saying?  Not being
21  seen by the doctor.  So from time -- from the time that the
22  pain first started until I was healed, until it went away.
23          And also, I was subject to conditions of
24  confinement because of the result of Roseann Hawk giving me

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 61

1 them two big pitchers of water that I drank fully and by
2 her telling me that I -- it was okay for me to walk back to
3 the housing unit, and when I refused -- when I refused to
4 walk back to the housing unit because I couldn't walk, I
5 was placed in the segregation cell which has no toilet, and
6 I had to use the bathroom from drinking, evidently, the two
7 pitchers of water. And I was refused access to the toilet,
8 which led -- from me trying to hold it, led me to me
9 urinating on myself.
10       And the policy they have in IDOC, which I
11 have -- which I have -- which I have documented and
12 attached to the complaint is the laundry schedule and the
13 shower schedule. And I was not able to take a shower, nor
14 have a change in clothes, and I had to be in the clothes
15 that I urinated on myself in from trying to hold it for
16 three days. And I also hold -- I also hold -- I believe
17 Roseann Hawk should be held accountable for that, too,
18 because she had the ability for me not to -- to not say
19 that I was able to walk, which I couldn't, and which
20 ultimately led to me being instead and -- by her giving me
21 those two waters, led to me urinating myself and me having
22 to sit in urinated clothes with no shower or change of
23 clothes for three days. So I believe she played a part in
24 that suffering and that condition. Also for that claim of

## Page 62

1 condition of me being subject to conditions of confinement
2 and cruel and unusual punishment.
3       Q. So I want to hash that out a little bit, and
4 then I want to go back to the damages. You didn't have
5 contact with Roxanne Hawk until June the 1st of 2016; would
6 that be correct?
7       A. Yes.
8       Q. So Roxanne Hawk was not involved in your
9 healthcare prior to June the 1st of 2016; would that be
10 correct?
11       A. Yes.
12       Q. You didn't get the ticket from Roxanne Hawk,
13 did you?
14       A. No.
15       Q. Somebody else wrote that ticket?
16       A. Yes.
17       Q. Who wrote that ticket?
18       A. Officer Oelberg.
19       Q. You were found guilty of that ticket?
20       A. Yes.
21       Q. And as a result of being found guilty of that
22 ticket, you were placed in segregation for three days; is
23 that right, or two days?
24       A. I was placed in segregation because of the

## Page 63

1 ticket, not of the guilty -- of the guilty findings, but
2 because of the ticket, I was placed in seg.
3       Q. Okay. You were placed in segregation pending
4 the outcome of the ticket; is that right?
5       A. Yes.
6       Q. And then you were found guilty of the ticket;
7 is that right?
8       A. Yes.
9       Q. And Roxanne Hawk didn't have anything to do
10 with that ticket or you're being placed in segregation, did
11 she?
12       A. Yes. When she informed the officer that I was
13 able to walk back to the unit, that led to me getting wrote
14 the ticket because the ticket states that I was -- I
15 refused to go back to the housing unit when I was given
16 direct orders to, and I was unable to walk because of me
17 being dizzy and because the infection in my knee. So by
18 her informing that I was able to walk, she showed
19 deliberate indifference to a seriously -- to a serious
20 medical need, and it also led to me -- which her actions
21 also led to me being subject to conditions of confinement.
22       Q. All right. I asked a bad question, so I need
23 to go back a little bit more. What I was asking was,
24 Roxanne Hawk didn't write the ticket, did she?

## Page 64

1       A. No.
2       Q. And she didn't testify about the ticket, did
3 she?
4       A. Yeah, she was a witness. Yeah, she was.
5       Q. Okay. Did she provide testimony or any kind
6 of a written statement according to -- according to the
7 adjustment committee hearing?
8       A. No, she didn't. I don't believe so.
9       Q. Did you appear at the adjustment committee
10 hearing?
11       A. Yes.
12       Q. Did you see Roxanne Hawk at the adjustment
13 committee hearing?
14       A. No.
15       Q. Did you ask her any questions?
16       A. No.
17       Q. And did you see anyone else ask her any
18 questions about what she may have witnessed?
19       A. As far as at the -- at the -- after June 1st?
20       Q. At the disciplinary committee hearing, did
21 you --
22       A. No. No. No. I didn't see that.
23       Q. So she's just listed as a potential witness on
24 that ticket; is that right?

## Page 65

1    A  No.

2    Q  Or I'm sorry –

3    A  She's an actual witness.

4    Q  Okay.  Roxanne Hawk didn't place you in

5 segregation, did she?

6    A  No.

7    Q  And she didn't transport you from the

8 healthcare unit to segregation, did she?

9    A  No.

10    Q  Do you have any evidence that Roxanne Hawk

11 found any objective or made any objective findings that you

12 could not be – you could not return to your housing unit

13 on June 1st after she released you?

14    A  I depend solely upon the medical records as my

15 evidence as far as the objective to her opinion that I

16 could walk when it's stated that I was dizzy and the boil

17 upon my leg.

18    Q  Hang on just a second.  I need to look at

19 something.  How big was the boil on – Let's see -- on May

20 the 29th, the first time that you went to the healthcare

21 unit?

22    A  It was -- It was swollen, but it actually grew

23 over the time and -- but it was evidently -- something --

24 it was evidently, like, swollen.

## Page 66

1    Q  Okay.  So in your complaint, the first time

2 that you went to the healthcare unit, are you saying that

3 there was a boil or had you already popped it and there

4 wasn't a boil?

5    A  When I popped it, it healed, but my knee was

6 swollen.  It wasn't like what I would say an opening, an

7 opening in the infected area.

8    Q  There was no opening?

9    A  Yeah.  There was no drainage or no opening in

10 the infected area.  It was just swollen, and that -- that

11 was my concern because even though like the bump healed,

12 but my knee, it still hurts and it's getting bigger.  It's

13 getting swollen.  It's getting swollen.  So that's why I

14 dropped the -- I wrote the sick call.

15    Q  In June of 2016, you were in Housing Unit R1;

16 is that right?

17    A  That, I'm not exactly sure of.

18    Q  Okay.  Do you remember --

19    A  I believe --

20    Q  Go ahead.

21    A  I believe that to be true, though.  I'm not

22 certain.

23    Q  In the housing unit – Do you remember the

24 housing unit that you were in in May and June of 2016

## Page 67

1 before you went to seg?

2    A  Yeah, I believe it was Housing Unit 1.  I

3 believe that to be true.

4    Q  Is the housing unit air-conditioned?

5    A  No.

6    Q  Do you recall what the temperature was like at

7 the end of May and the beginning of June of 2016?

8    A  No.

9    Q  Do you recall that it was hot?

10    A  I'm not sure, but I'm sure it could be

11 Googled.

12    Q  When you're served or when you're offered

13 dietary -- Well, let's see.  You go to the dietary unit; is

14 that right?

15    A  Yes.

16    Q  As long as you're not in segregation; right?

17    A  Yes.

18    Q  So in May, the end of May, the beginning of

19 June, you would have been able to go to the dietary unit;

20 is that right?

21    A  Yes, and actually, I'm glad that you brought

22 that up.  On my way to the dietary is when I could no

23 longer walk because of the pain in my leg, and I actually

24 had to be escorted from me falling to the ground, not

## Page 68

1 injuring myself from falling, but I would need a break from

2 walking because of the pain in my knee from walking, and

3 they would have to actually escort me from the walk to the

4 healthcare unit because of that.

5    Q  And when did that start?

6    A  I believe -- If I'm not mistaken, I believe

7 June 1st is actually -- I believe, yeah, June 1st is

8 actually when it happened.  No, not June 1st.  Excuse me.

9 Not June 1st.  I think May 29th is when the incident I'm

10 describing.  I believe -- I believe May 29th and May 30th,

11 I think the two occasions that it happened as far as the

12 medical records are concerned.

13    Q  And when you say that you had to be escorted,

14 who escorted you?

15    A  That, I'm not sure.

16    Q  Was it inmates or was it security staff?

17    A  No.  It was either a nurse or a security

18 staff.

19    Q  Do you remember the name of the security

20 staff?

21    A  I do not remember.

22    Q  Do you remember the name of the nurse?

23    A  No.

24    Q  What meal was it?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                    Fax: 314.644.1334

## Page 69

1  A  That, I do not remember either.  It was nearly
2  three years ago.
3  Q  When you went from the housing unit to the
4  dietary unit, did you go for breakfast?
5  A  No.
6  Q  You skipped breakfast?
7  A  Yeah.
8  Q  Always?
9  A  I don't eat breakfast.
10  Q  Okay.  Did you skip the lunch meal?
11  A  No.
12  Q  So you were able to go to the dietary unit for
13  lunch; is that right?
14  A  I believe so.
15  Q  And then did you skip the evening meal?
16  A  Probably.  It varies.
17  Q  When you go to the dietary unit, do you eat
18  everything that's offered?
19  A  Sometimes.  I eat enough where I'm satisfied.
20  Q  And are you offered as much as you can drink?
21  A  You get a cup of water.
22  Q  Are you offered anything else besides water?
23  A  Milk sometimes.
24  Q  Any juice?

## Page 70

1  A  (Witness shakes head negatively.)
2  Q  You need to give a verbal response.
3  A  No.
4  Q  Do you drink coffee?
5  A  Sometimes.
6  Q  When you drink coffee, do you drink it in the
7  morning or at lunch or at your evening meal or some other
8  time?
9  A  It varies.
10  Q  Do you remember if you drank coffee in May --
11  late May or early June of 2016?
12  A  I'm not sure if I was drinking coffee at that
13  time.  No, I'm not sure.
14  Q  In -- And I want to limit my time frame to May
15  and June of 2016 for these next few questions.  Do you
16  recall whether you -- Did you drink water other than when
17  you were in the dietary unit?
18  A  Yes.
19  Q  Okay.  When did you drink it?  I mean, what
20  was your normal practice?
21  A  I try to drink eight to ten cups of water.
22  Q  Did you have any problems urinating?
23  A  No.
24  Q  And did you suffer from constipation?

## Page 71

1  A  No.
2  Q  Where do you get the water when you drink that
3  eight to ten cups of water a day?
4  A  A faucet.
5  Q  In your cell?
6  A  Yes.
7  Q  Or somewhere else?
8  A  Yes, in my cell.
9  Q  Do you have a cup in your cell?
10  A  Yes.
11  Q  Do you still have a cup?
12  A  Yes.
13  Q  Do you drink the water all at once or do
14  you -- do you drink it throughout the day?
15  A  Periodically throughout the day.
16  Q  Now, when in May and June of 2016, not while
17  you were in segregation, but when you were in Housing Unit
18  R or R1, were you able to participate in yard?
19  A  Yes.  Yes.
20  Q  And was that outside?
21  A  Yes.
22  Q  And it looked to me like you played some
23  basketball; is that right?
24  A  Yes.

## Page 72

1  Q  Because you injured your ankle, I think; is
2  that right?
3  A  Yes.
4  Q  Besides basketball, anything else that you do
5  to participate in yard or between May and June of 2016?
6  A  Exercise.
7  Q  How do you exercise?
8  A  I exercise.
9  Q  Right.  What do you do to exercise?
10  A  Work out, like pullups, dips, just -- You know
11  what I'm saying?  Just multiple things.
12  Q  Do you do that on the yard or do you do that
13  in your cell or do you do it both places?
14  A  I work out, yeah -- Well, sometimes both.
15  Q  And when you say dips, is that when you put
16  weights on your shoulders and you --
17  A  No, it doesn't -- It doesn't have nothing to
18  do with weights.  It's just like -- You're using your own
19  body weight when you lift, you push yourself.
20  Q  Okay.  So do you stand -- do You stand and
21  then you bend at the knee?  Is that -- and then you come
22  back up?
23  A  No.
24  Q  Tell me what a dip is.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us                                    Fax: 314.644.1334

## Page 73

1    A  A dip is the arm exercises.  It doesn't have
2  anything to do with your lower body.
3    Q  Okay.  So tell me what a dip is then.
4    A  A dip is you use your -- you have like two
5  bars.  It can be two bars going -- like two bars --
6    Q  Horizontal?
7    A  Yeah, you just push up off of them.
8    Q  Oh, okay.  So like they're parallel bars and
9  you just push --
10    A  Yes.
11    Q  Okay.
12    A  And you keep going up and down like that.
13    Q  All right.  And you do that on the yard?
14    A  Yes.
15    Q  You don't do that in your cell?
16    A  You could in a different fashion.
17    Q  Okay.
18    A  But it doesn't involve your legs or lower
19  body.
20    Q  Okay.  Do you lift weights when you're in the
21  yard?
22    A  Yes, sometimes.
23    Q  And do you do squats or do you -- what kind
24  of --

## Page 74

1    A  Usually when I do squats, I don't use weights.
2  I use my body weight.
3    Q  Do you do any other kind of lifting?
4    A  It depends.
5    Q  Okay.  Can you tell me what you do to lift
6  weights?  What kinds of -- what categories of weightlifting
7  you do?
8    A  Arms, chest, shoulders.  I do my lower body,
9  squats, but I don't use weights for that.  That's basically
10  like the basics.
11    Q  Do you bench press?
12    A  Yes.
13    Q  And you did that in May and June of 2016?
14    A  I think probably some early June, but when my
15  knee, when my knee was infected, I wasn't really -- I
16  couldn't do -- I couldn't walk very far.  My limit was
17  probably to the dietary and probably that's about it.
18    Q  But that resolved itself with the prescription
19  of Bactrim that Dr. Sood gave you?
20    A  Yeah.
21    Q  And you've been able to exercise since the
22  infection resolved?
23    A  Yes.
24    Q  I don't have any -- I do want to go back to

## Page 75

1  your damages, your claim of damages.  So you told me that
2  you -- you told me what you wanted the $250,000 for, but
3  you didn't tell me how you calculated that.  So what I'm
4  interested in knowing is, how is it that you came up with
5  that sum of money?
6    A  The sum of money is for the condition of
7  confinement and the deliberate indifference to a serious
8  medical need, and I tied Roseann Hawk also to the
9  deliberate indifference to a serious medical need for her
10  knowing I couldn't walk and not -- in the manner and
11  treatment towards that, towards knowing that I couldn't
12  walk and also informing -- also telling Lieutenant Jones
13  that I was able to walk back to the unit, which I couldn't,
14  which also led to the condition of confinement.
15      So that whole experience from her showing
16  deliberate indifference to a serious medical need and me
17  being subject to a condition of confinement and
18  segregation, I come up with that total as in a three part,
19  like they -- three, like, split it equally.  Like, they
20  all -- all three defendants equally, their actions equally
21  should compensate the amount that I requested.
22    Q  Sure.  What you're telling me now is the why,
23  and I'm asking how you come up with that amount.  I want to
24  know economically what you base that on.  In other words,

## Page 76

1  how is it that you calculated that this is worth $250,000?
2    A  My answer would be the same as why that I just
3  explained to you.
4    Q  Well, and that's not what I'm looking for.  So
5  for example, normally in a damages case, somebody says I'm
6  owed -- and I'm just going to throw out some numbers here.
7  I'm owed a thousand dollars because when I went to the
8  doctor it cost me a thousand dollars to pay the doctor
9  bill.  So that's how I come up with a thousand dollars.  Or
10  I am -- because of the accident that I had, I'm going to
11  need a new wheelchair.  So a wheelchair costs $1,200, so I
12  want $1,200 to compensate me for the $1,200 that I'm going
13  to have to pay for the wheelchair.  So what I'm asking you
14  is, how do you come up with $250,000?  Now do you
15  understand?
16    A  Yes, now I understand.
17    Q  Okay.  All right then.
18    A  I came up with the 250,000 because I was --
19  suffered from her -- deliberate indifference to a serious
20  medical need and I had to endure conditions of confinement
21  being in urinated clothes and not being able to shower for
22  three days and being in seg and all of that because of
23  Roseann Hawk's actions.
24    Q  Okay.  Well, so here's kind of what I'm

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us      Fax: 314.644.1334

## Page 77

1  getting at. You didn't have a job when you were at Hill,
2  so you didn't lose any money from your job. So I'm having
3  trouble understanding what it is that you're being
4  compensated for, for any kind of a loss. So can you help
5  me out here? What is it that you lost that you feel that
6  you need to be compensated for?
7     A  I experienced, what you say, cruel and unusual
8  punishment, and I want to be compensated for the cruel and
9  unusual punishment and compensated for be subjected to
10  conditions of confinement, and punitive damage for the
11  deliberate indifference to a serious medical need and --
12  but that's basically by us -- also by the deliberate
13  indifference to a serious medical need I was subjected to
14  the conditions of confinement, of which I wanted to be
15  compensated for.
16     Q  So the $250,000 encompasses both compensatory
17  damages and punitive damages; is that correct?
18     A  Yes. Wait. No. That's just the
19  compensation. The punitive damages I want to leave to the
20  court of whatever they deem just.
21     Q  And what do you think is -- What do you think
22  is just for punitive damages?
23     A  I'm going to leave that in the court's hands.
24     Q  Do you have a crime victim?

## Page 78

1     A  Yes.
2     Q  And do you understand that any money that you
3  get over $500 would go to pay your crime victim?
4     A  I don't understand that.
5     Q  Do you know how much you owe your crime
6  victim?
7     A  No, I don't.
8     Q  Do you know what the -- In your criminal case
9  there were some court costs and some fines; is that
10  correct?
11     A  Yes.
12     Q  Do you know what those are?
13     A  No. But --
14     Q  Go ahead.
15     A  No, but I don't know.
16     Q  Your conviction was out of Cook County?
17     A  Yes.
18     Q  Do you know the number of your criminal case?
19     A  Not right off the bat.
20     MS. McNAUGHT: That's all I have for now.
21  Thank you, Mr. Harris.
22     A  Okay.
23        EXAMINATION
24  QUESTIONS BY MS. PATEL:

## Page 79

1     Q  Good afternoon, Mr. Harris. My name is Hinal
2  Patel, and I'm from the attorney general's office. I
3  represent Lieutenant Jones and Officer Oelberg in this
4  action. I wanted to go back through and just kind of
5  reiterate some of the points that you've already spoke to
6  co-defendant's counsel about. Is that okay?
7     A  Yes.
8     Q  Okay. Give me one second to get organized
9  here. Mr. Harris, who is Craig Jones?
10     A  Craig Jones at that time is the lieutenant
11  that worked at Hill Correctional Center during May and June
12  of 2016.
13     Q  And did you meet Lieutenant Jones on June 1st,
14  2016?
15     A  Yes.
16     Q  And on June 1st, 2016, that was when you had
17  requested your medical emergency; is that correct?
18     A  June 1st?
19     Q  Yes.
20     A  Yes.
21     Q  And that was when you were in the dayroom and
22  you had told the other inmates that you were feeling dizzy;
23  is that correct?
24     A  Yes, and I couldn't walk.

## Page 80

1     Q  And then did you inform the inmates to reach
2  out to staff?
3     A  Yes.
4     Q  And that was when Lieutenant Jones arrived; is
5  that correct?
6     A  Yes.
7     Q  And you said it took him about ten minutes to
8  arrive; is that correct?
9     A  Yeah, approximately.
10     Q  And then what did you tell Lieutenant Jones
11  when he arrived?
12     A  I told him that I was dizzy and I couldn't
13  walk.
14     Q  Okay.
15     A  Because of the infection in my knee.
16     Q  That's what you told Lieutenant Jones?
17     A  That's what I informed him of.
18     Q  And what did he say?
19     A  He said, I believe you're faking, and he told
20  me that we're not going to carry you because I believe
21  you're faking.
22     Q  Okay. And then so how did you get to the
23  emergency van golf cart?
24     A  Some inmates volunteered -- he personally

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 81

1  asked, who wants to carry this guy because I am personally
2  not about to do it because he's faking it.
3      Q   So Lieutenant Jones asked some of the inmates
4  to assist in bringing you to the golf cart emergency van?
5      A   Yeah, he asked them did they want to
6  volunteer.
7      Q   Okay. And then the inmates and Lieutenant
8  Jones took you to the golf cart van on a backboard; is that
9  correct?
10     A   Lieutenant Jones did not assist in that at
11 all. It was four -- I think it was three -- it was
12 probably like three or four inmates who helped me to the
13 ambulance.
14     Q   And Lieutenant Jones was with those three or
15 four inmates taking you to the van; is that correct?
16     A   He watched them take me to the van.
17     Q   And he accompanied them as you went to the
18 van?
19     A   Yes.
20     Q   Okay. And then it was Lieutenant Jones that
21 took you in the van to the healthcare unit?
22     A   No.
23     Q   Who took you in the van to the healthcare
24 unit?

## Page 82

1      A   Well, I'm not sure who was driving, but I
2  don't think it was him.
3      Q   Okay. Lieutenant Jones wasn't in the van with
4  you or on the golf cart with you when you went from your
5  housing unit to the healthcare unit?
6      A   I believe not.
7      Q   So how many people were in that van with you?
8      A   I actually couldn't -- I couldn't see who was
9  driving. I couldn't see.
10     Q   Okay. So then you arrived at healthcare;
11 right?
12     A   Yes.
13     Q   And then who helped you out of the van onto
14 the wheelchair?
15     A   I believe medical staff.
16     Q   Was Lieutenant Jones there at that time?
17     A   Yes.
18     Q   So Lieutenant Jones was outside of the
19 healthcare unit?
20     A   Actually, I don't know the answer to that. I
21 don't know the answer to that.
22     Q   So you didn't see Lieutenant Jones outside the
23 healthcare unit when you were going into the wheelchair?
24     A   I believe -- if I -- The best of my knowledge,

## Page 83

1  I believe he was there outside the healthcare unit and then
2  he left.
3      Q   So how did Lieutenant Jones get from your
4  housing unit to the healthcare unit?
5      A   That, I don't know. I'm not sure if he walked
6  or he was -- I'm not sure.
7      Q   But you say you did see him there when you
8  were getting into the wheelchair?
9      A   Yes.
10     Q   Okay.
11     A   I believe so.
12     Q   Did he come into the healthcare unit with you?
13     A   I know -- I know he wasn't there for a certain
14 period of time, and he was calling back there when -- I
15 know he -- I saw him outside the healthcare unit, but I
16 think he left from there.
17     Q   Okay. And then when you were saying that you
18 had seen him again, was that after you were supposed to be
19 discharged, is that what you're talking about?
20     A   Yes, when Roseann Hawk said I was able -- I
21 was able to go back.
22     Q   Okay. So you get to the healthcare unit and
23 the healthcare staff puts you in a wheelchair and takes you
24 inside?

## Page 84

1      A   Yes.
2      Q   And then while you were under the care of the
3  healthcare unit staff, did you see Lieutenant Jones?
4      A   No.
5      Q   And then about how long did it take you to get
6  to the healthcare unit from your housing unit?
7      A   From the healthcare unit to my housing unit?
8      Q   I'm sorry. Let me rephrase that. From the --
9  From your housing unit to the healthcare unit?
10     A   It depends what time. From what time?
11     Q   Let me rephrase.
12     A   From the ambulance?
13     Q   Yes, when you were on the golf cart van to get
14 to the healthcare unit.
15     A   Probably two minutes.
16     Q   So from the time that you had complained of
17 being dizzy to arriving at healthcare, I think you
18 previously stated it took about a half hour; is that
19 correct?
20     A   Yes.
21     Q   Okay. Now, you previously stated when you
22 were talking to co-defendant's counsel about your claims
23 with a few of the defendants in this action, and I wanted
24 to reiterate that again. So your claims as they pertain to

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 85

1 Lieutenant Jones, you stated that your deliberate
2 indifferent claim centers around Lieutenant Jones didn't
3 carry you from the dayroom housing unit to the van; is that
4 correct?
5     A   Yes, the manner, and he took -- and like the
6 manner and the way he talked, saying I'm faking, and his
7 body language and the words he used. And, yes, that's part
8 of the deliberate indifference claim.
9     Q   Okay. And then I believe you also previously
10 stated that the second claim as it pertains to Lieutenant
11 Jones was when you were put in a wheelchair to leave the
12 healthcare unit on June 1st, 2016; is that correct?
13     A   Yes. Yes.
14     Q   Okay. And those are your two claims as they
15 pertain to Lieutenant Jones; is that correct?
16     A   No. I mean, that's part. The deliberate
17 indifference claim what I am alleging against it was he --
18 by saying I'm faking when I told him I was dizzy and I
19 couldn't walk because of the blister on my knee and him not
20 placing me -- not placing me on the thing and having random
21 inmates to do it. And also, he was the one who
22 wheelchaired me to seg and placed me in the holding cages
23 to be sent to seg. It was -- Yeah.
24     Q   Okay. So your -- The first claim that I

## Page 86

1 discussed about the deliberate indifference against
2 Lieutenant Jones pertains to that point in time in which
3 you had complained of the dizziness, Lieutenant Jones
4 arrived, and you're claiming the manner in which you were
5 then transported to the healthcare unit; is that correct?
6     A   Yeah. The manner and also the action of
7 placing me -- of having knowledge that I can't walk and
8 that I was dizzy and still placing me in segregation
9 because of not walking. The reason why I was placed in
10 segregation was because I disobeyed a direct order ticket
11 to walk back to the housing unit, and you have knowledge
12 that I couldn't walk from when he brung me from the housing
13 unit, so I'm also placing on the deliverance of his action
14 of placing me in seg for not walking back to the unit when
15 he had knowledge that I couldn't walk back to the unit.
16     Q   Right. And that's the second instance in
17 terms of -- I'm separating them for timeline purposes. So
18 that first instance is prior to you being in your housing
19 unit, going to the healthcare unit, being transported to
20 the healthcare unit, and then that second instance that you
21 were alleging of deliberate indifference pertains to when
22 you were leaving the healthcare unit; is that correct?
23     A   Yes.
24     Q   Leaving the healthcare unit and being

## Page 87

1 transferred to the segregation holding cell; is that
2 correct?
3     A   Yes.
4     Q   Okay. So at the healthcare unit -- And I'm
5 not going to go through all the medical documents again,
6 but essentially you were seen by the healthcare staff for
7 various medical issues; is that correct?
8     A   Yes.
9     Q   Okay.
10     A   The dizziness and me not being able to walk
11 because of the boil on my knee.
12     Q   Okay. And how long was your visit in the
13 healthcare unit on June 1st, 2016?
14     A   Not exactly sure. Maybe 30, 40 minutes.
15     Q   Okay. And just so you know, I'm talking about
16 the June 1st, 2016, visit at 6:54 p.m.
17     A   Yeah. I can't calculate how long the visit
18 was, but if I would guess, 30, 40 minutes.
19     Q   Okay. And then after that visit, you were
20 told that you were able to leave the healthcare unit; is
21 that correct?
22     A   Yes, by Roseann Hawk. She informed that --
23 security that I was able to walk back to the housing unit,
24 and that's when -- When I refused to walk back to the

## Page 88

1 housing unit, that's when Lieutenant Jones was called to
2 escort me, and he informed me that if I don't get up and
3 walk to the unit, that he's taking me to seg. And I told
4 him I couldn't walk, and he escorted me to segregation.
5     Q   Okay.
6     A   And I was placed in a holding cage.
7     Q   So when you said the medical staff informed
8 security that you were -- you could be discharged, who was
9 informed?
10     A   Sergeant Hilsdorf and Lieutenant Jones.
11     Q   Okay. So that's when you saw Lieutenant Jones
12 again?
13     A   Yes.
14     Q   Did he and Sergeant Hilsdorf arrive at the
15 same time?
16     A   No, Sergeant Hilsdorf was already there.
17     Q   Okay. And then what happened when the
18 sergeant had arrived?
19     A   She was already there. She was basically,
20 like, overseeing what was going on, filling in for
21 Lieutenant Jones when he left, my understanding. And when
22 I told -- when I told her -- when I refused -- When she
23 gave me the direct orders to go back to the housing unit
24 and I refused because I informed her that I couldn't walk,

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 89

1  and that's when she got on her walkie-talkie and called
2  Lieutenant Jones.
3     Q   And you testified earlier that she gave you
4  three direct orders to — for you to return back to your
5  cell; is that correct?
6     A   Yeah, I believe that's what happened.
7     Q   Okay.  And was Nurse Hawk present during this?
8     A   Yes.
9     Q   So she gave you three direct orders to leave
10  the healthcare unit, and you stated you couldn't walk.  So
11  then she called Lieutenant Jones?
12     A   Yes.  She told me to walk back to my housing
13  unit, I told her I couldn't walk, and she contacted
14  Lieutenant Jones.
15     Q   Okay.  So now Lieutenant Jones has arrived,
16  and what happened after that?
17     A   He told me to get up and walk back to my -- He
18  asked Roseann can he walk, and I believe she said yeah.
19  And he said get up and walk back to your housing unit, and
20  I told him, sir, I can't walk.  And he -- Like my leg, I'm
21  dizzy.  And he -- While I was still in the wheelchair, he
22  wheelchaired me to segregation.
23     Q   Okay.  So he took you in your wheelchair to a
24  segregation holding cell; is that correct?

## Page 90

1     A   Yes.
2     Q   Okay.  And was this because of refusing the
3  three direct orders from the sergeant?
4     A   Yes.
5     Q   So around what time did you arrive at the
6  segregation holding cell?
7     A   That, I do not know.
8     Q   Okay.  Are there other segregation holding
9  cells in that area?
10     A   I don't believe so.  I think it's -- Actually,
11  it's two of them identical; right?  It's — The only thing
12  that is separating them was the brick wall.  They are right
13  next to each other, and they both made the exact same way.
14  The same way with no toilet in it.
15     Q   Was someone else in the other adjoining
16  segregation holding cell?
17     A   No.
18     Q   So you were the only one in those holding
19  cells?
20     A   Yes.
21     Q   Was there any staff around in that area?
22     A   Officer Oelberg -- Once Lieutenant Jones
23  escorted me to the holding cage, it was up to, I believe,
24  the duty of Oelberg to transition me into seg from that

## Page 91

1  point forward.
2     Q   Okay.  So Lieutenant Jones put you in the
3  segregation holding cell and then did he leave?
4     A   Yes.
5     Q   Okay.  So you didn't see him after this?
6     A   I did see him after that.
7     Q   When did you see him again?
8     A   He came back after I urinated myself.
9     Q   Okay.  So this is still on June 1st, 2016?
10     A   Yes.
11     Q   So now you're in the segregation holding cell,
12  and you stated Officer Oelberg was there.  Who is — Who
13  was Officer Oelberg?
14     A   Officer Oelberg, that is the officer when I
15  asked him, can I use the bathroom, and he didn't allow me
16  to use the bathroom.
17     Q   Okay.  Was there —
18     A   That's the one who -- he wrote the ticket for
19  health and sanitation.
20     Q   Okay.  Was there any other staff that was in
21  this area?
22     A   No.
23     Q   So it was just you and Officer Oelberg?
24     A   Yes.

## Page 92

1     Q   Were there any other inmates in this area?
2     A   No.
3     Q   How long were you in the segregation holding
4  cell for?
5     A   I would say it was like 30, 40 minutes.
6     Q   Okay.  And then after those 40 minutes, you
7  were transported to your permanent segregation cell?
8     A   Yeah.  I believe so, yes.
9     Q   So you're in your -- in the segregation
10  holding cell prior to being put into your permanent
11  segregation cell, and what happens when you get in the
12  cell?
13     A   Excuse me.  Repeat that for me.
14     Q   Okay.  So you're currently in the segregation
15  holding cell, and you said that you were there for about 40
16  minutes.  So you're in the cell.  What happens when you
17  first get in the cell after Lieutenant Jones has secured
18  you in that cell?
19     A   I changed from my regular inmate blues, which
20  is a T-shirt and pants, and they gave me like a one -- like
21  a onesie jumpsuit, and I was commanded to put that on.  And
22  at this time, I'm like in -- I'm still -- I'm in a chair.
23  I'm sitting in a chair.
24     Q   You're still in your wheelchair?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376

www.alaris.us

Fax: 314.644.1334

## Page 93

1    A    Say what?
2    Q    You're still in your wheelchair?
3    A    I believe I'm -- I believe I'm in a regular
4  chair. I'm in some type of chair. I don't know if they
5  took the wheelchair, but I'm sitting down in either the
6  wheelchair or a regular chair.
7    Q    So did Lieutenant Jones take the wheelchair
8  after he transported you to the segregation holding cell?
9    A    I believe so. I believe I'm in
10  a regular chair now.
11    Q    So you no longer have a wheelchair, you're
12  sitting down in just a regular chair in the holding cell?
13    A    Yes. Yes.
14    Q    Okay. And who asked you to change into the
15  jumpsuit?
16    A    I believe -- I think Lieutenant Jones.
17    Q    So Lieutenant Jones asked you to change into
18  the jumpsuit?
19    A    Yes.
20    Q    Was this immediately upon when you were put
21  into the cell?
22    A    Yes.
23    Q    Okay. So how long after you were put into the
24  holding cell did Lieutenant Jones leave?

## Page 94

1    A    He left probably soon after.
2    Q    Okay.
3    A    Yes.
4    Q    Okay. So you were -- You changed into the
5  jumpsuit, and then what happened? Did Lieutenant Jones
6  take your blue clothing?
7    A    I think it was either -- I think I tossed it
8  aside. I tossed it out of the little hole.
9    Q    Okay. Did somebody pick it up?
10    A    I believe it was probably still laying there.
11  I'm not sure exactly how every little -- I think either it
12  was still laying there or probably somebody picked it up.
13  I don't know.
14    Q    Who handed you the jumpsuit that you had to
15  change into?
16    A    I believe Lieutenant Jones or Oelberg, one of
17  them. I'm not sure.
18    Q    Okay. So you received the jump -- Excuse me.
19  The jumpsuit that you needed to change into, you changed
20  into it, you tossed your other clothing outside, and then
21  what happened?
22    A    And then probably like 15 minutes later, I
23  informed Officer Oelberg that I needed to use the bathroom.
24  And he was like, you better hold it. And then probably

## Page 95

1  like a few minutes later -- then I kept asking him and he
2  was like -- I think at one point he was like, too F-ing
3  bad, the cuss word, the F-U-C-K-I-N-G word. He's like too
4  F-ing bad. And at that point, I'm still trying to hold it,
5  and I ended up urinating on myself while in the -- in the
6  clothes I was wearing.
7    Q    Okay. So after you changed into your
8  jumpsuit, you said 15 minutes later you asked Officer
9  Oelberg if you can use the restroom; is that correct?
10    A    I believe approximately like 15 minutes later.
11    Q    And what was his response?
12    A    His response was -- well, I know what stood
13  out to me was -- I believe his last response was, too
14  F-U-C-K-I-N-G bad.
15    Q    And what do you mean by his last response?
16    A    I asked him multiple times, can I use the
17  bathroom.
18    Q    How many times did you ask him?
19    A    At least three.
20    Q    So that first time you asked him, what did he
21  say?
22    A    He said wait. And the second time, you better
23  hold it. And I believe the last response I got from him
24  was, too F-ing bad.

## Page 96

1    Q    When you asked the first time and he said
2  wait, did he say why?
3    A    No.
4    Q    And then you said you asked him a second time;
5  is that correct?
6    A    Yes.
7    Q    And that second time he said to hold it. Did
8  he tell you why?
9    A    No.
10    Q    And then you asked a third time; is that
11  correct?
12    A    Yes.
13    Q    And that's when he gave you that response;
14  correct?
15    A    I believe so, yes.
16    Q    Okay. Did you ask -- How long did you wait
17  between the three responses to ask?
18    A    I believe it was -- I'm certain it was minutes
19  apart.
20    Q    Like one to two minutes apart?
21    A    Yeah.
22    Q    Did you tell him why you had to use the
23  restroom?
24    A    Yes. I informed him that I drunk two big cups

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376          Fax: 314.644.1334
www.alaris.us

# SIDNEY HARRIS  5/22/2019

## Page 97

1  of water --
2  Q  When did you -- Oh, go ahead. Sorry.
3  A  -- and that I needed to use it really bad.
4  Q  Okay. When did you inform him that you drank
5  the two big cups of water?
6  A  Probably during the in-between times of me
7  asking him, the minutes in between.
8  Q  And you said that there was no other staff in
9  this area at this time; is that correct?
10  A  Yes.
11  Q  At any point in time during your interaction
12  with Officer Oelberg, was there any staff present?
13  A  Not during the time that led me to urinate on
14  myself. After I urinated on myself, he contacted
15  Lieutenant Jones.
16  Q  Okay. Okay. How far between asking him that
17  third and final time whether you can use the restroom did
18  you urinate on yourself?
19  A  Did I -- Repeat the question for me, please.
20  Q  So you asked Officer Oelberg on three
21  occasions if you could use the restroom; correct?
22  A  Yeah, I believe it was more than three
23  occasions, but I know three, at the least.
24  Q  Okay. How many times do you recall requesting

## Page 98

1  to use the restroom then?
2  A  I recall three.
3  Q  Okay. So after asking him that third and
4  final time, how long after that time did you urinate on
5  yourself?
6  A  Probably about two minutes.
7  Q  And then did you inform him of that?
8  A  That I urinated?
9  Q  Yeah.
10  A  I believe he saw it as it was happening.
11  Q  Okay. And then what happened?
12  A  And he -- he was disgusted and --
13  Q  Okay. Is that when he called Lieutenant
14  Jones?
15  A  Yeah, he informed Lieutenant Jones.
16  Q  So then Lieutenant Jones arrived; is that
17  correct?
18  A  Yes.
19  Q  And what happened when Lieutenant Jones
20  arrived?
21  A  He said -- Wait. He basically escorted me --
22  he escorted me to -- I believe he said -- I believe he said
23  something -- he said like -- Well, long story short, he
24  escorted me to my segregation cell.

## Page 99

1  Q  Okay.
2  A  In a wheelchair. I'm going to say he
3  escorted -- He got the wheelchair and escorted me to my
4  segregation cell in a wheelchair.
5  Q  Okay. So when Lieutenant Jones arrived, he
6  brought a wheelchair with him?
7  A  Yes.
8  Q  So prior to Lieutenant Jones arriving, you
9  received a health and sanitation ticket from Officer
10  Oelberg; is that correct?
11  A  Yes.
12  Q  And were you found guilty of that ticket that
13  was issued to you by Officer Oelberg?
14  A  Yes.
15  Q  Has that ticket ever been expunged or
16  reversed?
17  A  No.
18  Q  So that ticket still stands as you being
19  guilty; is that correct?
20  A  Yes.
21  Q  And did you have a hearing for that ticket?
22  A  Yes.
23  Q  And that hearing, was that June 3rd, 2016?
24  A  Yes.

## Page 100

1  Q  And did you have an opportunity to speak at
2  that hearing?
3  A  Yes, I did.
4  Q  And did you -- What did you say at that
5  hearing?
6  A  I told him that I couldn't walk. I told him
7  exactly what happened. I couldn't walk -- that I couldn't
8  walk. And when they gave me the direct orders to go back
9  to my housing unit, they put me in a holding cage, and I
10  tried to -- I tried to explain to -- that I urinated on
11  myself and -- but they still found me guilty of both
12  tickets.
13  Q  And did you request any witnesses at this
14  hearing?
15  A  No.
16  Q  Are you looking at the adjustment committee
17  report, Mr. Harris?
18  A  I'm looking at multiple paperwork.
19  Q  Okay. Okay. So you did not request any
20  witnesses at this hearing; right?
21  A  I don't believe so.
22  Q  Was Lieutenant Jones present at this hearing?
23  A  No.
24  Q  Okay. Was Officer Oelberg present at this

## Page 101

1    hearing?

2    A    No.

3    Q    Were there any other individuals present at

4    this hearing?

5    A    There was me, Barbara King and I think it was

6    just me and the adjustment committee members.

7    Q    Okay. And I'm going to backpedal real

8    quickly, so bear with me, Mr. Harris. Is your claim

9    against Officer Oelberg his deliberate indifference to not

10   allowing you to use the toilet on June 1st, 2016?

11   A    It's -- Yes. The deliberate indifference for

12   not letting me use the toilet and by me warning him

13   multiple times that I had to use the bathroom and him

14   knowing that it's not a toilet in there, and also

15   conditions subject -- also conditions of confinement I was

16   subjected to urinating on myself and being in that state

17   for three days. And, yeah, that's -- that's -- Yeah.

18   Q    Okay. And the conditions of confinement claim

19   that you state, that was when you had been moved to your

20   permanent segregation cell; is that correct?

21   A    No, from when I was -- this is like the time

22   it started when I was in the segregation holding cage with

23   no toilet in it when I needed to use the bathroom and

24   Oelberg didn't allow me to use the bathroom.

## Page 102

1    Q    Is that your only claim against Officer

2    Oelberg?

3    A    Deliberate indifference and conditions of

4    confinement, yes.

5    Q    And those two pertain to when you were in the

6    segregation holding cell; correct?

7    A    Yes, and to the -- and to the three days of me

8    being subjected to being in urinated clothing for three

9    days.

10   Q    So that's also encompassing when you were

11   moved to your permanent segregation cell?

12   A    Yes.

13   Q    Okay.

14   A    Because he was the cause -- He took part of

15   not letting me use the bathroom and urinating on myself.

16   Q    And did he accompany you and Lieutenant Jones

17   when you were moved to your permanent segregation cell?

18   A    He was watching. I believe he was watching.

19   But Lieutenant Jones walked -- I believe walked me there by

20   myself. That's what I believe.

21   Q    Mr. Harris, did you suffer any injuries as a

22   result of Lieutenant Jones' conduct?

23   A    No.

24   Q    You did not suffer any injuries as a result of

## Page 103

1    Lieutenant Jones' conduct; is that correct?

2    A    Not physical -- not injury that he imposed on

3    me physically himself.

4    Q    Did you suffer any non-physical injuries as a

5    result of Lieutenant Jones' conduct?

6    A    Yes.

7    Q    What are those injuries?

8    A    I suffered from being -- I suffered from

9    urinating on myself, trying to hold my bladder and

10   urinating on myself and being subjected to being in the

11   clothes that I urinated in for three days -- for three days

12   with no showers for three days.

13   Q    Any other injuries?

14   A    No.

15   Q    Okay.

16   A    I also suffer from the result of the

17   disciplinary actions of not knowing the restrictions that

18   were imposed on me from the tickets that was written.

19   Q    Did Lieutenant Jones write any of those

20   disciplinary tickets?

21   A    No. Just for -- for your -- that you're

22   representing only Oelberg.

23   Q    Okay. Have we discussed all your injuries as

24   a result of Lieutenant Jones' conduct?

## Page 104

1    A    Deliberate indifference as far as not having

2    the knowledge of my knee and dizziness, not being able to

3    walk and miss -- and the manner he handled the situation

4    and by sending me to -- authorizing me to go to segregation

5    for not being able to walk and also made me leave --

6    leading up to me urinating on myself during that three days

7    and also the restrictions from the disciplinary reports.

8    That's all of it in full.

9    Q    So those are all the injuries you believe you

10   suffered as a result of Lieutenant Jones' conduct?

11   A    Yeah, deliberate indifference and conditions

12   of confinement.

13   Q    And what injuries did you suffer as a result

14   of Officer Oelberg's conduct?

15   A    Deliberate indifference for him knowing that I

16   had to use the bathroom and me asking him multiple times

17   and not having -- not being -- not giving me any relief and

18   not having access to a toilet, and also conditions of

19   confinement from that point, and also leading on to me

20   urinating myself and having to be in that -- being subject

21   to that for three days in the same clothing, and also from

22   the ticket he wrote which led on to the restrictions.

23   Q    Okay. What injury did you suffer as a result

24   of Officer Oelberg writing the disciplinary ticket?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376

www.alaris.us                                Fax: 314.644.1334

## Page 105

1    A   No personal physical injury. I just was being
2  subjected to deliberate indifference to a serious medical
3  need and deliberate indifference of knowing that I had to
4  use the bathroom and not allowing me access to it, being
5  subjected to conditions of confinement with no access to
6  the toilet and being subjected -- and him also -- and him
7  also knowing that if he -- that the ticket could lead to
8  restrictions.
9    Q   So you didn't suffer any personal injuries as
10 a result of the disciplinary ticket?
11   A   No.
12   Q   Have we discussed all of the injuries you
13 believe you suffered as a result of Officer Oelberg's
14 conduct?
15   A   Yes.
16   Q   And, Mr. Harris, have I given you a chance to
17 discuss all your claims against Lieutenant Jones?
18   A   Yes.
19   Q   And have I given you a chance to discuss all
20 your claims against Officer Oelberg?
21   A   Yes.
22   Q   Now, you mentioned earlier as it pertains to
23 the damages that you're requesting in this case that it's
24 250,000 in compensatory damages; is that correct?

## Page 106

1    A   Yes.
2    Q   Now, is that $250,000 divided between the
3  three defendants?
4    A   Yes.
5    Q   Okay. And then how did you -- how did you
6  determine these amounts per each defendant?
7    A   From -- from being -- from them -- the
8  deliberate indifference to a serious medical need and them
9  having knowledge of my -- that I was dizzy and couldn't
10 walk and of my boil on my knee and being subject to
11 conditions of confining me and not having access to a
12 toilet and me -- also led me to urinate on myself and had
13 to be in urinated clothes for three days and, like I said,
14 cruel and unusual punishment.
15   Q   And how did you use those instances -- excuse
16 me, instances to add up to the amount of $250,000?
17   A   Repeat that question for me, please.
18   Q   Based on all of your allegations, how did you
19 calculate and, like, do the math essentially that these
20 instances and these allegations add up to $250,000 in
21 compensatory damages?
22   A   Because of them having knowledge of my -- me
23 being dizzy and not able to walk for Lieutenant Jones, him
24 individually, and being deliberate indifference to that --

## Page 107

1  to a serious medical need and walking me to seg and placing
2  me in a holding cage with no toilet and placing me in seg
3  while I endured three days being in urinated clothes and
4  being subjected to cruel and unusual punishment and
5  conditions of confinement. And as far as Oelberg, he had
6  some information that I asked him I need to use the
7  bathroom multiple times, and he knew that I was placed in a
8  holding cage with no access to a toilet and still neglected
9  my right to use the bathroom. So deliberate indifference
10 and conditions of confinement and I had to be in clothes
11 for three days and cruel and unusual punishment. That's
12 cruel and unusual punishment.
13   Q   Okay. Are there any other damages that you're
14 seeking other than the $250,000 in compensatory damages?
15   A   Yes.
16   Q   What are those?
17   A   Punitive damages and whatever the courts deems
18 just.
19   Q   And how much in punitive damages?
20   A   I'll leave that open for the court to rule on
21 that decision.
22   Q   Okay. Now, this is just kind of a last kind
23 of all-encompassing catch-all. So, Mr. Harris, is there
24 any other information that you wish to tell us about the

## Page 108

1  claims in your present suit? This is just an opportunity
2  for you.
3    A   I depend solely on the evidence as far as like
4  the tickets, the documents. And it's all true, and I just
5  want to be justly compensated for the validation of -- for
6  the validation of my U.S. constitutional rights.
7        MS. PATEL: Okay. Thank you, Mr. Harris.
8  Those are all the questions that I have. I'm going to turn
9  it back over to co-defendant's counsel.
10          EXAMINATION
11 QUESTIONS BY MS. McNAUGHT:
12   Q   Mr. Harris, I thought of some other questions
13 that I need to ask you. After this bout --
14   A   Go ahead. My bad. Excuse me. Keep going.
15   Q   After this bout of dizziness that you had
16 in -- on June the 1st of 2016, did that resolve itself or
17 have you continued to have dizzy spells?
18   A   I got to use the bathroom. I need to take a
19 break for the bathroom.
20   Q   Sure. That's fine.
21        (Whereupon, a short break was taken.)
22   Q   (By Ms. McNaught) After this bout of dizziness
23 that you had in June, on June the 1st of 2016, did you --
24 did that resolve itself or have you had similar experiences

SIDNEY HARRIS  5/22/2019

## Page 109

1  of dizziness?
2      A  I believe that situation was because of the
3  infection in my knee and because -- Yeah, because it wasn't
4  like any prior experiences.
5      Q  That's not what I'm asking.  What I'm asking
6  is, did it continue or did it get finished after you had
7  that bout of dizziness on June 1st?
8      A  No, it lingered until the infection was gone.
9      Q  Okay.  After you took -- I mean, as soon as
10  you finished the medicine, the dizziness went away?
11      A  I'm not sure.  I'm not sure if the medicine
12  or -- after the infection went away, the dizziness went
13  away.
14      Q  And you haven't had the dizziness since?
15      A  No, not like that.  No.
16      Q  Now, you were prescribed Motrin on May the
17  29th; is that right?
18      A  Yeah, I believe so.  Yes.
19      Q  And did they give you a blister pack or did
20  they just give you the Motrin when you needed it?
21      A  They gave me a package with about -- I think
22  it was about probably 16 pills, 200 milligrams each, and a
23  bag of ice.
24      Q  And they told you to take the Motrin as you

## Page 110

1  needed it?
2      A  One or four times -- three or four times a
3  day.  I mean, one to four pills three times a day.
4      Q  And did you completely finish that blister
5  packet of Motrin?
6      A  I only used it as needed.  When the pain got
7  real worse, then I took it.  But I'm not exactly sure about
8  if I completed it or not because I think I had multiple
9  packets.  I think I had -- between that and 800 milligrams
10  I was prescribed, I think I still maybe had some.  I'm not
11  sure, though.  I don't know.
12      Q  You were given a blister pack on May the 29th;
13  is that right?
14      A  Yes.
15      Q  Of Motrin; right?
16      A  Yes.
17      Q  And were you given another blister pack on May
18  the 30th or were you supposed to use the same blister pack?
19      A  I think I was supposed to use the same one.
20      Q  Okay.
21      A  I don't know.  I'm not sure.
22      Q  That makes sense.  And then when you saw
23  Dr. Sood on May the 31st, he gave you the Bactrim; right?
24      A  Uh-huh (yes).

## Page 111

1      Q  Yes?
2      A  Yes.
3      Q  Sorry.  You have to give verbal responses so
4  the court reporter can take it down.
5      A  Okay.
6      Q  And did you get a blister pack of the Bactrim?
7      A  Yes.
8      Q  Yes.
9      A  Yeah, that's the copies of both of them in an
10  exhibit -- a copy of the packages that Dr. Sood issued --
11  prescribed to me.  Actual physical copies on top of the
12  scanner.
13      Q  What is it that you copied?  The blister
14  packs?
15      A  Yes.
16      Q  Do you know what page that is?
17      A  It's under exhibit -- just exhibit.  Probably
18  only the first -- It's under exhibit.
19      Q  Oh, I see it.  Yes.  It looks to me like these
20  blister packs are full; is that right?
21      A  No, they've actually all been used, but I kept
22  the copy -- I kept them for evidence.
23      Q  Okay.
24      A  I kept the package for evidence.

## Page 112

1      Q  All right.  What you're claiming as the
2  Bactrim is labeled as Sulfatrim DS; is that right?
3      A  That's what the package says.  I'm not sure
4  what it is.  That's what I was prescribed by the doctor.
5      Q  And then it says generic for Bactrim DS?
6      A  Yep.
7      Q  Okay.  And were you given 24 pills or are the
8  ones that are blacked out, were those already taken off?
9      A  That, I do not know.
10      Q  Okay.  You just don't remember how many you
11  took?
12      A  No, I don't mean -- I took them as prescribed.
13  I don't remember if it was a four -- if it was -- if all
14  the bubbles was four.
15      Q  But you took the amount that was prescribed;
16  is that right?
17      A  Yes.
18      Q  You didn't take any more, you didn't take any
19  less?
20      A  No, I didn't take any more or less than what
21  was advised.
22      Q  And then you were also given a prescription of
23  Ibuprofen; is that right?
24      A  Yes, 800 milligrams.

28 (Pages 109 to 112)

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 113

1   Q   And that's generic for Motrin; is that right?
2   A   Yes.
3   Q   And you were told to take one pill twice a day
4   as needed for pain; is that right?
5   A   I believe so.  I believe that is correct.
6   Q   And you took all of the 24 pills that you were
7   provided?
8   A   I'm not sure if it was filled up for 24.
9   That, I don't know.
10  Q   But you did take the pills that were
11  prescribed, no more, no less; is that correct?
12  A   Yes.
13  Q   And both of those were given to you in a
14  blister pack to take as in your cell; is that right?
15  A   Yes.
16  Q   And you took those in your cell as prescribed?
17  A   Yes.
18  Q   Do you know how Roxanne Hawk got to your
19  housing unit on June the 1st of 2016?
20  A   No.
21  Q   But the van was already there; is that right?
22  A   Yes. Yes.
23  Q   And you don't know whether she was the one to
24  drive the van back; correct?

## Page 114

1   A   Yes.  I don't know.
2   Q   But she was at the housing unit when you were
3   at the housing unit, and then she was at the healthcare
4   unit when you were at the housing unit; is that correct?
5   A   I believe so.
6   Q   Where is the housing unit in relation to the
7   healthcare unit?
8   A   Short distance, probably two or three minute
9   walk.
10  Q   Is the housing unit on the east side of the
11  facility?
12  A   I'm not sure what the directions of where the
13  facility is located.
14  Q   Okay.  If you come in and out of the front of
15  the building at Hill Correctional Center, is Housing Unit R
16  on the left-hand side?
17  A   Yes.
18  Q   And the – is it the first housing unit that
19  you come to?
20  A   Yes.
21  Q   And the healthcare unit would be on the
22  right-hand side?
23  A   Yes.
24  Q   And it's essentially the first building after

## Page 115

1   the administration building?
2   A   Yes.
3   Q   So the van ride was probably about 30 seconds
4   or so?
5   A   I believe it could have been from one or two
6   minutes.
7   Q   But it's a – It was a relatively short time?
8   A   Yes.
9   Q   Now, when Roxanne Hawk got to your housing
10  unit, she didn't prohibit you from laying on the table, did
11  she?
12  A   No.
13  Q   And although she spoke about whether she
14  believed the symptoms of your condition, you were taken to
15  the healthcare unit; correct?
16  A   Yes.
17  Q   Do you recall the names of the inmates who
18  took you to the -- or who took you on the backboard?
19  A   No.
20  Q   And I want to go to the discovery, the initial
21  disclosures that you sent to us.  And you said that there
22  are no names of people who you're going to use to support
23  your claim.
24  A   No.

## Page 116

1   Q   Has that changed?
2   A   No, I depend solely upon what I attached to
3   the original complaint.  If I have anything extra that I
4   choose to use against you all, I will send each of you all
5   a copy.
6   Q   That's fine.  I just – I still want to go
7   through your initial disclosures just – on the record just
8   to make sure.  And other than your medical records, you
9   don't have any other exhibits that you're relying upon, do
10  you?
11  A   Yes, I am relying upon the disciplinary
12  reports, the adjustment committee summary judgment report,
13  the grievances, the grievance procedure and photos of the
14  medication packages and the segregation -- the segregation
15  privileges.
16  Q   But those documents were all attached to your
17  complaint; right?
18  A   Yes.
19  Q   Okay.  You don't have any other documents, do
20  you?
21  A   No, not that I intend to use against you.
22  Q   Okay.  Has anyone ever told you that if
23  Roxanne Hawk would have transported you five or ten minutes
24  earlier that – to the healthcare unit that your infection

ALARIS LITIGATION SERVICES
www.alaris.us          Phone: 1.800.280.3376          Fax: 314.644.1334

## Page 117

1  would have -- or your outcome would have been different?
2  A  No.
3  Q  And the reason that you're upset with Roxanne
4  Hawk is because she didn't believe you when you said that
5  you were dizzy and you didn't feel good; is that right?
6  A  I wouldn't say upset, but the reason why I'm
7  bringing this complaint about is because violation of my
8  constitutional rights of her showing deliberate
9  indifference to a serious medical need and causing me to be
10  subjected to conditions of confinement.
11  Q  And that's because she said that she didn't
12  believe you when you told her that you were dizzy; is that
13  right?
14  A  Yes, and that I couldn't walk.
15  Q  Now, Roxanne Hawk didn't cause you any
16  physical injury, did she?
17  A  No.
18  Q  When -- I want to go to when Roxanne Hawk was
19  at the -- you and Roxanne Hawk were at the healthcare unit
20  and she told you or she told security staff that you were
21  ready to go back to your housing unit.  Are you with me,
22  where it is that I'm about ready to ask about?
23  A  Yes.
24  Q  Did she -- When she said he's ready to go back

## Page 118

1  to the housing unit, did she leave then or did she stay?
2  A  She stayed.
3  Q  How long did she stay?
4  A  She was there all the way up until they
5  escorted me into segregation.
6  Q  She was with you the whole time?
7  A  She was in the healthcare unit the whole time.
8  Q  And what -- Okay.  So you were in -- You were
9  in a clinic room in the healthcare?
10  A  I wouldn't say a room.  An area.  An area.
11  Not like a room where it's closed door.  An open area.
12  Q  Okay.  And when she -- when Roxanne Hawk --
13  She looked at you when you were in the healthcare unit;
14  right?
15  A  Yes.
16  Q  And she gave you water; right?
17  A  Yes.
18  Q  And she attended to you; correct?
19  A  She examined me.
20  Q  And when she said to the lieutenant, he's
21  ready to go back to his housing unit, then did she go about
22  her duties and do other things or was she physically
23  present side-by-side or across from you the whole time?
24  A  She was physically present and in eyesight.

## Page 119

1  Q  Was she doing other things?
2  A  She was watching, walking around.
3  Q  Was she watching you?
4  A  Yes, she was watching what was taking place.
5  Q  Was she writing notes?  Was she charting?
6  A  I just -- I just know she was there.
7  Q  Okay.
8  A  I'm not sure what she was doing.  She was
9  walking.  She was doing certain stuff, but she was there.
10  Q  Okay.  So she was there, but she was doing
11  other things while you were sitting there?
12  A  Sometimes.
13  Q  Her sole focus was not on you the whole time,
14  was it?
15  A  I believe so.
16  Q  You do.  If she says something different, you
17  wouldn't have anything to refute that, would you?
18  A  No.
19  Q  Do you get any money from family and friends?
20  A  Sometimes.
21  Q  Since you filed this lawsuit, have you gotten
22  money from your family and friends?
23  A  I would rather keep that personal.  Like, you
24  know what I'm saying?  Not comment on that.

## Page 120

1  Q  Well, you asked --
2  A  May I ask what that has to do --
3  Q  Sure.
4  A  -- with the claim that I have?
5  Q  The court allowed you to file as a pauper,
6  didn't it?
7  A  Yes.
8  Q  And so it goes to your pauper status.  So have
9  you received money from your family and friends?
10  A  Yes, I have.  I receive money.
11  Q  Since the filing of this lawsuit?
12  A  Yes.
13  Q  Do you have a faucet or did you have a faucet
14  in your segregation cell on June 1st and 2nd and 3rd of
15  2016?
16  A  Yes.
17  Q  And did you have the ability to wash your
18  hands and wash up?
19  A  The first day, I didn't.  The second day, they
20  give you some of your stuff, like your -- some of your
21  stuff.
22  Q  They give you personal property?
23  A  Yes, some certain items.
24  Q  Okay.  Do you recall what personal property

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
Fax: 314.644.1334
www.alaris.us

## Page 121

1  they gave you the second day that you were in segregation?
2  　　　A　A sheet, cover, books, pencil, pen, multiple
3  items.
4  　　　Q　Is that from your property that was in Housing
5  Unit R? Did they back that up and give that to you in
6  segregation or is that —
7  　　　A　Yes.
8  　　　Q　— Is that a hygiene bag or whatever it is
9  that you get because you're in segregation?
10 　　　A　No. They -- it's my personal stuff.
11 　　　Q　Did they pack up all of your personal property
12 and give it to you in segregation?
13 　　　A　No, you can't have all of it. Just certain
14 items.
15 　　　Q　What items were you allowed to have?
16 　　　A　Books, blanket, deodorant, toothpaste and
17 mail.
18 　　　Q　Is that also attached to your complaint?
19 　　　A　Yes, it is, as -- it's listed under exhibit
20 essential segregation property.
21 　　　Q　And did you get all of the things that are
22 listed or were there some items that you did not get?
23 　　　A　The items that are checked off.
24 　　　Q　Yeah. My copy doesn't have a good checkoff,

## Page 122

1  so can you just go through those and tell me what is
2  checked off?
3  　　　A　My copy isn't -- that I got isn't that good
4  either. I probably got the same copy you got.
5  　　　Q　Okay. Do you have a recollection of the
6  things that you got?
7  　　　A　I know I got my stuff to sleep with.
8  　　　Q　So you got your blanket?
9  　　　A　Yes.
10 　　　Q　Okay. Did you get books and magazines?
11 　　　A　Yes, I believe so.
12 　　　Q　Did you get a chain?
13 　　　A　No.
14 　　　Q　Dentures or denture cleaner?
15 　　　A　No.
16 　　　Q　Deodorant?
17 　　　A　I'm not sure. Probably so. I'm not sure of
18 exactly everything I had in my cell at that time.
19 　　　Q　Eyeglasses?
20 　　　A　Maybe.
21 　　　Q　Do you wear glasses?
22 　　　A　I'm not sure.
23 　　　Q　Do you wear glasses?
24 　　　A　To read sometimes.

## Page 123

1  　　　Q　Fan?
2  　　　A　No. I'm not sure.
3  　　　Q　Hair comb?
4  　　　A　Maybe.
5  　　　Q　Laundry bag?
6  　　　A　Yes.
7  　　　Q　Laundry -- legal materials?
8  　　　A　Yes.
9  　　　Q　Lotion?
10 　　　A　I'm not sure.
11 　　　Q　Mattress?
12 　　　A　Yes.
13 　　　Q　Medication?
14 　　　A　Yes.
15 　　　Q　And what medication did you get?
16 　　　A　I believe I still had my -- these -- the
17 medication that was prescribed to me in the exhibits.
18 　　　Q　The blister packets?
19 　　　A　Yes.
20 　　　Q　Photo album?
21 　　　A　I believe so.
22 　　　Q　Photos?
23 　　　A　Yes.
24 　　　Q　Pillow?

## Page 124

1  　　　A　Yes.
2  　　　Q　Ink pen?
3  　　　A　Yes.
4  　　　Q　Pillowcase?
5  　　　A　No.
6  　　　Q　Prayer rug?
7  　　　A　No.
8  　　　Q　Ring?
9  　　　A　No.
10 　　　Q　Shampoo?
11 　　　A　No.
12 　　　Q　Sheets?
13 　　　A　Yes.
14 　　　Q　Shower shoes?
15 　　　A　Yes.
16 　　　Q　Soap dish?
17 　　　A　Yes.
18 　　　Q　Soap?
19 　　　A　I believe so.
20 　　　Q　Socks?
21 　　　A　Yes.
22 　　　Q　Toothbrush?
23 　　　A　Yes.
24 　　　Q　Toothpaste?

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
Fax: 314.644.1334
www.alaris.us

## Page 125

1    A  Yes.

2    Q  Towels?

3    A  Yes.

4    Q  Undershirts?

5    A  Yes.

6    Q  Underwear?

7    A  Yes.

8    Q  Washcloth?

9    A  Yes.

10    Q  Watch?

11    A  No.

12    Q  Thermal top?

13    A  No.

14    Q  Thermal bottom?

15    A  No.

16    Q  Was there anything else that you remember

17 getting?

18    A  No.

19    Q  So was all of that delivered in your property

20 box?

21    A  It was — Yeah.  Yeah.  Yeah.  It was inside

22 my property box.

23    Q  And when you left segregation, did you get all

24 of those things that were in your property box returned

## Page 126

1 back to you when you went to Housing Unit R?

2    A  Yes.

3    Q  And did you get your property box as soon as

4 you returned to your housing unit?

5    A  Yes.

6    Q  You didn't have to wait?

7    A  No.

8    Q  You've used the term "deliberate indifference"

9 several times while you've discussed your claims.  Is that

10 what you understand as the legal standard to prove your

11 case in federal court?

12    A  That also, but my term is when a person have

13 knowledge of something and refuse to act on it.

14    Q  Is that your understanding of what it is that

15 you need to prove in order to success — be successful in

16 your federal lawsuit?

17    A  That's my understanding of a violation of my

18 constitutional rights.

19    Q  So tell me what you think deliberate

20 indifference to a serious medical need is.

21    A  Deliberate indifference to a serious medical

22 need is when Nurse Hawk had knowledge that I was dizzy and

23 could not walk because of the boil on my leg but still

24 chose to tell Lieutenant Jones that I was able to walk back

## Page 127

1 to my housing unit when she also knew that a code three was

2 called because I couldn't walk and I was wheelchaired in

3 emergency ambulance to the healthcare unit.

4    Q  Do you think that there are any other

5 components to deliberate indifference that you need to

6 prove in order to be successful in your case?

7    A  As far as with Nurse Hawk, no.

8    EXAMINATION

9 QUESTIONS BY MS. PATEL:

10    Q  I had a couple of follow-up questions.  You

11 stated — So we went through the items that you received in

12 your property box when you went to segregation and you said

13 that was on day two.  So did you receive those — that

14 property on June 1st or June 2nd of 2016?

15    A  It's the next day.  I believe June 2nd.

16 Actually — Actually, I'm not sure of the date because I

17 can't see it, but I know that you sign it.  You sign it

18 either — I think I signed it that same night, but you

19 don't get it until the next day.

20    Q  So you went into segregation on June 1st,

21 2016; correct?

22    A  Yes.

23    Q  And then you testified that day two of your

24 segregation time you received your property box; is that

## Page 128

1 correct?

2    A  Yes.

3    Q  So if you went into segregation on June 1st of

4 2016, your second day in segregation would be June 2nd,

5 2016; is that correct?

6    A  Yes.

7    Q  So on June 2nd, 2016, was that where you

8 received the property that we went through that's attached

9 to your complaint?

10    A  Yes.

11    MS. PATEL:  That's all the questions that I

12 have.

13    MS. McNAUGHT:  Mr. Harris, we have neared the

14 conclusion of the deposition.  Now, there are some rules

15 that we all have to follow, so I'm going to explain those

16 to you.  All right?

17    THE WITNESS:  Yes.

18    MS. McNAUGHT:  You have the opportunity to

19 relive this entire experience all over again by reading the

20 transcript, or if you trust the court reporter to take down

21 accurately what we have said and what you have said, you

22 can waive that.  But you need to tell the court reporter

23 now whether you want to read and relive this deposition or

24 whether you want to waive your signature.

ALARIS LITIGATION SERVICES
Phone: 1.800.280.3376
www.alaris.us
Fax: 314.644.1334

## Page 129

1  THE WITNESS: When you say relive, do I get a
2  written copy of it?
3  MS. McNAUGHT: They will show you a copy, but
4  you can't make a copy and you can't keep a copy unless you
5  pay for it until the lawyers file a motion for summary
6  judgment.
7  THE WITNESS: Okay. I will --
8  MS. McNAUGHT: Waive?
9  THE WITNESS: I would like a copy, and how
10  much would it cost?
11  MS. McNAUGHT: Well, it would cost about $300.
12  THE WITNESS: Whoa. So is there any way I
13  can -- You say I can see it without paying for it?
14  MS. McNAUGHT: You can. The court reporter
15  will send it to the institution, the institution will place
16  you in a room, they'll let you read it, you can change
17  mistakes that the court reporter made, but you cannot
18  change your testimony.
19  THE WITNESS: Yes, I would like that.
20  MS. McNAUGHT: Okay. All right. He will
21  reserve signature then. Thank you, Mr. Harris.
22  THE WITNESS: Thank you.
23  THE REPORTER: Copies of the transcript?
24  MS. McNAUGHT: Etrans.

## Page 130

1  MS. PATEL: E-copy.
2
3  (Deposition was adjourned at 1:14 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 131

1  CERTIFICATE OF REPORTER
2
3  I, Jamie Jo Kinder, CCR No. 842, CSR No.
4  084.003306, do hereby certify that the witness whose
5  testimony appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness was taken
7  by me to the best of my ability and thereafter reduced to
8  typewriting under my direction; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken, and further that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or
13  otherwise interested in the outcome of the action.
14  /s/ Jamie Jo Kinder
15
16  Certified Shorthand Reporter
17
18
19
20
21
22
23
24

## Page 132

1  ALARIS LITIGATION SERVICES
2
3  May 30, 2019
4
   Ms. Hinal A. Patel
5  ASSISTANT ATTORNEY GENERAL
   500 South Second Street
6  Springfield, IL  62701

7  IN RE: SIDNEY HARRIS, #M-37506 v. CRAIG JONES, et
      al.
8
   Dear Ms. Patel:
9
   Please find enclosed your copies of the deposition of
10 SIDNEY HARRIS taken on May 22, 2019 in the
   above-referenced case. Also enclosed is the original
11 signature page and errata sheets.

12 Please have the witness read your copy of the
   transcript, indicate any changes and/or corrections
13 desired on the errata sheets, and sign the signature
   page before a notary public.
14
15 Please return the errata sheets and notarized
16 signature page within 30 days to our office at 711 N
17 11th Street, St. Louis, MO 63101 for filing.
18
19 Sincerely,
20
21
22 Jamie Jo Kinder
23
24 Enclosures

Page 133

1        ERRATA SHEET
Witness Name: SIDNEY HARRIS
2    Case Name: SIDNEY HARRIS, #M-37506 v. CRAIG JONES, et
al.
3    Date Taken: MAY 22, 2019

4    Page #_____ Line #_____
5    Should read: _____
6    Reason for change: _____
7
8    Page #_____ Line #_____
9    Should read: _____
10   Reason for change: _____
11
12   Page #_____ Line #_____
13   Should read: _____
14   Reason for change: _____
15
16   Page #_____ Line #_____
17   Should read: _____
18   Reason for change: _____
19
20   Page #_____ Line #_____
21   Should read: _____
22   Reason for change: _____
23
24   Witness Signature: _____

Page 134

1    STATE OF _____)
2
3    COUNTY OF _____)
4
5    I, SIDNEY HARRIS, do hereby certify:
6        That I have read the foregoing deposition;
7        That I have made such changes in form
8    and/or substance to the within deposition as might
9    be necessary to render the same true and correct;
10       That having made such changes thereon, I
11   hereby subscribe my name to the deposition.
12       I declare under penalty of perjury that the
13   foregoing is true and correct.
14       Executed this _____ day of _____,
15   20___, at _____.
16
17
18
19   _____
20         SIDNEY HARRIS
21
22   _____
23         NOTARY PUBLIC
24   My Commission Expires:

34 (Pages 133 to 134)

Torrey Harris #M1031906
968 E. Morton Ave.
Jacksonville IL 63650

RECEIVED

AUG 0 5 2019

U.S. CLERK'S OFFICE
ROCK ISLAND, ILLINOIS

U.S. District Court
Central District of Illinois
Office of the Clerk

CLER211 61201-RFS-1A18
NOTIFY SENDER OF NEW ADDRESS 08/02/19
:CLERK US DISTRICT COURT
131 E 4TH ST STE 250
DAVENPORT IA 52801-1532

✳ R ✳
F
S

X-RAYED

