044123/19344/JNR/DSF

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

SIDNEY HARRIS,

        Plaintiff,

v.

JONES, RYAN OELBERG AND HAWK,

        Defendants.

Case Number  18 cv 4095

Judge Sara Darrow

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COMES defendant, Roxanne Hawk, by and through her counsel, CASSIDAY SCHADE LLP, and, pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submits her amended memorandum of law in support of her motion for summary judgment.  In support thereof, the following statements are made.

## INTRODUCTION

Plaintiff claims he had a boil on his knee that he broke open in late May 2016. He sought treatment between May 29, 2016, and May 31, 2016.  On May 31, 2016, plaintiff was treated by Dr. Kul Sood, who prescribed an antibiotic, which plaintiff began taking immediately.

Plaintiff claims on the evening of June 1, 2016, he became dizzy and had to lie on a table in his housing unit.  Plaintiff requested a medical emergency to be called, and Nurse Roxanne Hawk was summoned to the housing unit where plaintiff resided.  While attending to him, plaintiff claims Nurse Hawk stated that she thought plaintiff was "faking" and refused to carry him on a litter to transport him to the Healthcare Unit. Although Nurse Hawk did not carry the litter, security staff used other inmates to carry plaintiff to a golf cart ambulance, which then transported plaintiff to the Healthcare Unit.

At the door of the Healthcare Unit, plaintiff was transferred from the litter to a wheelchair and was assessed further and treated by Nurse Hawk. After Nurse Hawk provided treatment, she advised security staff plaintiff could return to his housing unit.

Plaintiff brought suit against, *inter alia*, Roxanne Hawk, a Registered Nurse, pursuant to 42 USC §1983, alleging that she was deliberately indifferent to his medical condition on June 1, 2016. Plaintiff claims Nurse Hawk showed deliberate indifference to his medical condition, because she told plaintiff she did not believe he was dizzy; because she did not personally and physically transport him on a litter from the table where he was lying to the golf-cart ambulance outside the housing unit; and because, when she had completed the treatment protocol in the Healthcare Unit, she released plaintiff to security staff, indicating he could walk to his housing unit.

Plaintiff cannot establish he was at a substantial risk of serious harm at any time relevant to his contact with Nurse Roxanne Hawk. Although plaintiff was already on antibiotics, when he complained to security staff, Nurse Hawk was summoned to his housing unit. She observed him and had him taken to the Healthcare Unit, where she addressed his medical concerns. Plaintiff was released to security staff. Plaintiff did not return to the Healthcare Unit for any complaints about an infection in his knee. No reasonable jury could find in favor of plaintiff, and therefore summary judgment is appropriate.

### UNDISPUTED MATERIAL FACTS

1.      Plaintiff, Sidney Harris, entered the Illinois Department of Corrections on June 10, 2013. *See* Harris Deposition pp. 10-11.

2.      Plaintiff obtained a GED, but has no medical training. *See* Harris Deposition pp. 13-1.

3.      Plaintiff, Sidney Harris, was transferred from the Northern Reception and Classification Center at Stateville to Hill Correctional Center on July 16, 2013, and from Hill Correctional Center to Vienna Correctional Center on March 15, 2017.  *See* Harris Deposition pp. 11, 23.

4.      Roxanne Hawk is a Registered Nurse who, at all times materially relevant to the complaint, was an employee of Wexford Health Services working the 3:00 p.m. to 11:00 p.m. shift.  *See* Exhibit #1, ¶¶2-4.

5.      Dr. Kul Sood, is an physician licensed to practice medicine in Illinois and, at all times materially relevant to the complaint, was the Medical Director at Hill Correctional Center.  *See* Exhibit #2, ¶¶1-2.

6.      During the 7:00 a.m. to 3:00 p.m. shift, nursing staff run a Nurse Sick Call line every day in the Health Care Unit at Hill Correctional Center, in which inmates sign up and are sent a call pass to be seen.  *See* Exhibit #1, ¶9.

7.      When an inmate at Hill Correctional Center has a complaint about his medical condition, he may make a request to be seen at nurse sick call.  *See* Exhibit #1, ¶10.

8.      At nurse sick call, the inmate comes to the Healthcare Unit at Hill Correctional Center; is attended by nurse, who asks what the complaint is, takes vital signs, and assesses the inmate; and then a determination is made about whether a referral to a physician is necessary at that time.  *See* Exhibit #1, ¶11.

9.      Although Registered Nurses can offer over-the-counter medications, they cannot prescribe controlled substances.  *See* Exhibit #1, ¶12.

10.     Medical care is available to inmates at Hill Correctional Center 24 hours a day in the Health Care Unit to provide care to inmates in the case of emergencies.  *See*

Exhibit #1, ¶6.

11. If security staff believes there may be a medical emergency, a call is made by radio to the Healthcare Unit and medical staff are summoned to the area where the emergency may be. *See* Exhibit #1, ¶7.

12. Prior to May 27, 2016, plaintiff had not had any knee problems. *See* Harris Deposition p. 10.

13. Plaintiff claims on or about May 27, 2016, he developed a boil on his knee. *See* Harris Deposition p. 28; Exhibit 3 (IDOC Bates #1040); Exhibit #4 (Wexford Bates #797).

14. Plaintiff claims he popped the boil on his left knee on or about May 27, 2016. *See* Harris Deposition p. 28; Exhibit 3 (IDOC Bates #1040); Exhibit #4 (Wexford Bates #797).

15. Plaintiff made a written request to be placed on sick call to be seen for the boil on his left knee on May 29, 2016. *See* Harris Deposition pp. 28-29.

16. Plaintiff was initially evaluated by a nurse for the boil on his left knee when he was called to the healthcare unit on a nonemergency basis. *See* Harris Deposition p. 30; Exhibit 3 (IDOC Bates #1040); Exhibit #4 (Wexford Bates #797).

17. Plaintiff testified that after he popped the boil, there was no indication of drainage or an opening in the infected area. *See* Harris Deposition p. 66.

18. Plaintiff was evaluated by Nurse Crystal Harris on May 29, 2016, for the boil on plaintiff's left knee, but he was not referred to see the doctor at that time. *See* Harris Deposition pp. 31-32; Exhibit #1, ¶¶14-16; Exhibit 3 (IDOC Bates #1040); Exhibit #4 (Wexford Bates #797).

19. According to the medical records, Nurse Harris noted there was a small

open area at the left knee; pulses near the knee and ankle could be palpated, which is normal; there was slight swelling to the left knee; and the left knee was warm to the touch. *See* Exhibit #1, ¶15.

20.     Nurse Crystal Harris gave plaintiff Ibuprofen, told him to apply ice to his knee, and placed him in the infirmary for observation. *See* Harris Deposition pp. 31-32; Exhibit #1, ¶16; Exhibit 3 (IDOC Bates #1040); Exhibit #4 (Wexford Bates #797).

21.     In the infirmary on May 29, 2016, plaintiff was assessed by Nurse Julie Mackey at approximately 11:10 p.m., and plaintiff was able to sit on the side of the bed, his temperature and vital signs were within normal limits, and he was provided with Ibuprofen, but he refused additional ice for his knee. *See* Harris Deposition pp. 33-36; Exhibit #1, ¶17; Exhibit 3 (IDOC Bates #1041); Exhibit #4 (Wexford Bates #798).

22.     At approximately 9:00 a.m. on May 30, 2016, plaintiff was evaluated by Nurse Leola Parish, who noted plaintiff was resting, had no opening in the skin, had no drainage, had no fever, and when she took plaintiff's vital signs, they were within normal limits. *See* Harris Deposition pp. 37-38; Exhibit #1, ¶18; Exhibit 3 (IDOC Bates #1042); Exhibit #4 (Wexford Bates #799).

23.     Nurse Parish also reported she observed plaintiff with a steady gait. *See* Harris Deposition pp. 38-40; Exhibit #1, ¶18; Exhibit 3 (IDOC Bates #1042); Exhibit #4 (Wexford Bates #799).

24.     Nurse Parish gave plaintiff Motrin, and he was discharged to his housing unit. *See* Harris Deposition pp. 38-39; Exhibit #1, ¶19; Exhibit 3 (IDOC Bates #1042); Exhibit #4 (Wexford Bates #799).

25.     The medical records of Sidney Harris (M27506) indicate he returned to the Healthcare Unit on May 30, 2016, in the afternoon with a complaint of slight swelling to

his left knee and stated he could not walk, so he was seen by Nurse Delores Clark. *See* Exhibit #1, ¶20; Exhibit 3 (IDOC Bates #1044); Exhibit #4 (Wexford Bates #799).

26.     The medical records indicate Nurse Delores Clark observed Harris walking with a steady gait when unassisted on May 30, 2016. *See* Exhibit #1, ¶20; Exhibit 3 (IDOC Bates #1044); Exhibit #4 (Wexford Bates #801).

27.     Nurse Clark provided Motrin to plaintiff and placed him in the infirmary. *See* Harris Deposition p. 40; Exhibit 1, ¶21; Exhibit 3 (IDOC Bates #1044); Exhibit #4 (Wexford Bates #801).

28.     On May 30, 2016, at approximately 4:20 p.m., Nurse Roxanne Hawk observed plaintiff in the infirmary and he said that he could not walk, but then asked security staff, if he could use the telephone. *See* Exhibit #1, ¶22.

29.     On May 20, 2016, Nurse Roxanne Hawk questioned plaintiff about how he could use the telephone, if he could not walk, because he would have to walk to the telephone in the Healthcare Unit to use it. *See* Exhibit #1, ¶23.

30.     After Nurse Roxanne Hawk questioned plaintiff about being able to use the telephone on May 30, 2016, he laughed. *See* Exhibit #1, ¶¶23-24.

31.     On May 30, 2016, Nurse Roxanne Hawk did not observe plaintiff in any acute distress; he was alert and oriented to person, place, and time; his vital signs were within normal limits; he walked with a limp; there were no signs or symptoms of infection; there was no swelling or fever in his left knee; he denied tingling and numbness in his knee; and the pulses near his knee and ankle were palpable. *See* Exhibit #1, ¶25.

32.     The medical records indicate plaintiff was seen at approximately 11:15 p.m. on May 30, 2016, by Nurse Julie Mackey. *See* Harris Deposition p. 41; Exhibit #1,

¶26; Exhibit 3 (IDOC Bates #1047); Exhibit #4 (Wexford Bates #864).

33.    The medical records indicate Nurse Mackey took plaintiff's vital signs, checked plaintiff's knee, and provided him with Ibuprofen.  *See* Harris Deposition pp. 41-42; Exhibit #1, ¶26; Exhibit 3 (IDOC Bates #1047); Exhibit #4 (Wexford Bates #804).

34.    The medical records indicate plaintiff was seen by Dr. Sood on May 31, 2016.  *See* Harris Deposition p. 42; Exhibit ##1, ¶27; 2; 3 (IDOC Bates #1048);, ¶4, 4 (Wexford Bates #805).

35.    Dr. Sood noted during his examination of plaintiff on May 31, 2016, that his vital signs were within normal limits; there was no sign of fever; he was alert and oriented to time, place, and person; his neck was supple; his skin was warm and dry; his cardiac and abdomen were normal; he had no discharge from a boil; and his neurovascular system was intact.  *See* Exhibit #2, ¶5.

36.    As prophylaxis for potential infection, Dr. Sood prescribed an antibiotic to plaintiff and provided a lay-in for three weeks.  *See* Exhibit #2, ¶¶6-7.

37.    Dr. Sood prescribed Bactrim, an antibiotic, and Ibuprofen.  *See* Harris Deposition pp. 42, 110-111; Exhibit ##1, ¶27; 2; 3 (IDOC Bates #1048);, ¶7; 4 (Wexford Bates #865).

38.    Plaintiff took the Bactrim as prescribed.  *See* Harris Deposition p. 112.

39.    Plaintiff was discharged to his housing unit from the infirmary on May 31, 2016, after he saw Dr. Sood.  *See* Harris Deposition p. 43; Exhibit #1, ¶28; Exhibit 3 (IDOC Bates #1048); Exhibit #4 (Wexford Bates #805).

40.    Plaintiff testified the Bactrim prescription Dr. Sood ordered successfully treated the symptoms and the knee infection was resolved by June 2016.  *See* Harris Deposition pp. 10, 43, 74.

41.     At approximately 6:54 p.m. on June 1, 2016, plaintiff was in his housing unit, claimed he became dizzy, and laid on a table in the day room.  *See* Harris Deposition pp. 43-45.

42.     A correctional officer initially assessed the situation and then called Lieutenant Jones.  *See* Harris Deposition pp. 45-46.

43.     Lieutenant Jones called an emergency and Registered Nurse Roxanne Hawk was summoned to the plaintiff's housing unit.  *See* Harris Deposition pp. 43-44, 46; Exhibit #1, ¶¶29-30.

44.     Once she arrived at plaintiff's housing unit, Nurse Hawk went into the day room, which is a common area in the housing unit, and observed plaintiff lying on a table.  *See* Exhibit #1, ¶30.

45.     Nurse Hawk and Lieutenant Jones asked plaintiff about his condition, and plaintiff indicated he was dizzy, his knee was swollen and infected, and he could not walk.  *See* Harris Deposition p. 46.

46.     Nurse Hawk conducted an initial assessment of plaintiff and determined he should be taken to the Healthcare Unit at Hill Correctional Center.  *See* Exhibit #1, ¶31.

47.     Nurse Hawk and Lieutenant Jones asked plaintiff to try to get up and walk.  *See* Harris Deposition p. 46.

48.     Plaintiff indicated he did not think he could walk.  *See* Harris Deposition p. 46.

49.     Plaintiff was told by Lieutenant Jones that he and Nurse Hawk would not carry plaintiff.  *See* Harris Deposition p. 46.

50.     Nurse Hawk could not carry plaintiff for safety and security reasons.  *See*

Exhibit #1, ¶¶32-34.

51.     Plaintiff claims Roxanne Hawk had plaintiff transported to the healthcare unit, even though she did not believe plaintiff's symptoms.[1]  *See* Harris Deposition p. 115.

52.     A stretcher was brought into the housing unit, and 3 to 4 inmates carried plaintiff on the liter to a golf cart type ambulance to transport him to the healthcare unit. *See* Harris Deposition pp. 47-48, 81; Exhibit #1, ¶¶32, 35.

53.     Plaintiff was not required to walk from the housing unit to golf cart type ambulance.  *See* Harris Deposition p. 48.

54.     Plaintiff was transported on the golf cart ambulance to the healthcare unit, where he was placed in a wheelchair, and was not required to walk into the healthcare unit.  *See* Harris Deposition pp. 48-49; Exhibit #1, ¶¶32, 35.

55.     Medical staff assisted plaintiff from the golf cart ambulance into the wheelchair.  *See* Harris Deposition p. 82.

56.     When plaintiff arrived in the healthcare unit, he was assessed.  *See* Harris Deposition p. 49; Exhibit #1, ¶36.

57.     From the time he complained of being dizzy to arriving in the healthcare unit, approximately 30 minutes elapsed.  *See* Harris Deposition p. 84.

58.     Nurse Hawk did not delay in providing medical services to plaintiff, but, rather, had to rely upon the timing of security staff.  *See* Exhibit #1, ¶¶39-40.

59.     Plaintiff was promptly evaluated by Nurse Roxanne Hawk in the healthcare unit on June 1, 2016.  *See* Harris Deposition pp. 51-52.

60.     Nurse Roxanne Hawk took the vital signs of plaintiff, examined his knee,

---

[1]Defendant disputes Hawk told plaintiff she did not believe him, but for purposes of summary judgment only, accepts plaintiff's version of this fact.

and evaluated plaintiff for other neurological deficits.  *See* Harris Deposition pp. 53-55.

61.     Nurse Hawk observed plaintiff's vital signs were within normal limits and his pupils were equal, round, reactive to light and accommodation, which indicated an absence of neurological deficits.  *See* Exhibit #1, ¶36; Exhibit #2, ¶¶8-10.

62.     Plaintiff was assessed in the healthcare unit for approximately 30 to 40 minutes on June 1, 2016, by Nurse Hawk.  *See* Harris Deposition p. 87.

63.     After plaintiff saw Nurse Hawk, he was not prescribed any additional medications.  *See* Harris Deposition p. 58.

64.     Because of his complaints, Nurse Hawk provided plaintiff with hydration prior to releasing him to security staff.  *See* Exhibit #1, ¶37.

65.     According to Dr. Sood, hydration was the appropriate protocol for the symptoms articulated by plaintiff.  *See* Exhibit #2, ¶¶10-11.

66.     According to Dr. Sood, after he prescribed the antibiotic, there was no additional medication plaintiff required for any alleged infection to his knee.  *See* Exhibit #2, ¶¶12-14.

67.     Roxanne Hawk made no objective findings that would indicate plaintiff could not return to his housing unit on June 1, 2016.  *See* Harris Deposition p. 65.

68.     After the evaluation by Nurse Hawk, she informed security staff plaintiff was released to return to his housing unit.  *See* Harris Deposition pp. 56-57, 87.

69.     Roxanne Hawk did not cause plaintiff any physical injury.  *See* Harris Deposition p. 117.

70.     Plaintiff did not have further contact with Nurse Hawk after he was released to return to his housing unit.  *See* Harris Deposition pp. 57, 83, 87; Exhibit #1, ¶41.

71.    After May 31, 2016, plaintiff made no presentation of an infection in his knee of leg that required a prescription of antibiotics in addition to that provided by Dr. Sood.  *See* Exhibit #2, ¶15.

72.    Plaintiff has had no ongoing health concerns since he finished his prescription of Bactrim.  *See* Harris Deposition p. 74.

73.    Plaintiff has not been dizzy since the infection resolved in June 2016.  *See* Harris Deposition pp. 108-109.

74.    Plaintiff has no evidence his condition on June 1, 2016, would have been different had he been transported to the healthcare unit earlier.  *See* Harris Deposition pp. 116-117.

75.    Plaintiff has sued Roxanne Hawk because she said she did not believe plaintiff when he said he was dizzy and could not walk.  *See* Harris Deposition p. 117.

76.    Plaintiff believes Nurse Roxanne Hawk was deliberately indifferent to his medical condition, because he claimed to be dizzy and unable to walk because of the boil on his leg, but chose to tell Lieutenant Jones plaintiff could return to his housing unit and was ambulatory.  *See* Harris Deposition pp. 126-127.

77.    Plaintiff also claims Nurse Roxanne Hawk was deliberately indifferent because an emergency was called, and she would not carry plaintiff from the table in the day room to the ambulance golf cart outside the housing unit.  *See* Harris Deposition pp. 50, 126-127.

## ARGUMENT

### A.    Summary Judgment Standard

"Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the Court why a trial is not

necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). When the nonmoving party bears the burden of persuasion, this burden is not onerous and does not require the moving party to support its motion with affidavits or other similar materials regarding the opponent's claim. *Id.* A defendant's burden is satisfied by pointing out to the court the absence of evidence to support the nonmoving party's claim. *Id.* If a defendant meets this burden in showing there is an absence of evidence to support the plaintiff's claim, the plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which it will bear the burden of proof at trial. *Diperna v. Chicago School of Professional Psychology*, 893 F.3d 1001, 1006 (7th Cir. 2018). "As the put up or shut up moment in a lawsuit," summary judgment requires a nonmoving  party to respond to the moving party's properly supported motion by identifying  specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). "Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which [he] bears the burden of proof." *Id.* A mere scintilla of evidence in support of plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

**B.    Nurse Roxanne Hawk Is Entitled to Summary Judgment**

To prevail on an Eighth Amendment claim, a plaintiff must show the responsible prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 835, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999). The Eighth Amendment analysis involves a two-part test. The plaintiff must show (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard. *Sherrod v. Lingle*, 223 F.3d 605, 619 (7th Cir. 2000).

The required showing for deliberate indifference is "something approaching total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), *quoting Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). Plaintiff has the burden of proving defendant acted with a culpable mental state. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). This requires plaintiff to establish defendant knew of a serious risk to the plaintiff's health and consciously disregarded that risk. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). Defendant must have known of a substantial risk of serious harm and disregarded that risk. *McGee v. Adams*, 721 F.3d 474, 484 (7th Cir. 2013).

When assessing claims of deliberate indifference against a medical professional, the "professional judgment standard" applies. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Under this standard, a medical professional is entitled to deference in treatment decisions, unless no minimally competent professional would have so responded under the circumstances. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). A medical professional may be held to have displayed deliberate indifference only if "the decision by the professional is such a substantial

departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not base the decision on such a judgment." *Sain*, 512 F.3d at 895. The decision must be such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

In evaluating a claim that a medical professional failed to exercise professional judgment, a court is obliged to consider the totality of the plaintiff's medical care. *See Gutierrez*, 111 F.3d at 1374 (finding no deliberate indifference where the inmate "repeatedly received treatment over [a] ten-month period and . . . at most he experienced an isolated occasion or two where he did not receive prompt treatment").

"By definition a treatment that is based on professional judgment cannot evince deliberate indifference.…" *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir 2016). A medical professional's treatment decisions should be granted deference unless no minimally competent professional would have so responded under those circumstances. *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). Disagreement with the treatment decisions of a medical professional is not a basis for liability under 42 U.S.C. §1983. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The decision must be such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Expert testimony is necessary when the factual issues are outside the perception of a lay person. *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). When there is no expert testimony that a course of treatment was a substantial departure from accepted medical judgment and the decision is not so obviously wrong that a lay person could draw the required inference about the treater's state of mind, the medical treater is

entitled to summary judgment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016).

To prevail, plaintiff must prove Nurse Hawk subjectively knew plaintiff faced a substantial risk of serious harm when she failed to personally carry plaintiff to the cart and when she determined plaintiff could be released from the Healthcare Unit. If, as plaintiff claims, Nurse Hawk disbelieved plaintiff's complaints, she cannot be held liable. More importantly, defendant had plaintiff transported to the Healthcare Unit, assessed plaintiff, and provided treatment. Plaintiff cannot show any further treatment was medically needed and, if such treatment was needed, defendant was aware of that need.

In this case, plaintiff claims Nurse Roxanne Hawk was indifferent because she said she did not believe plaintiff when he said he was dizzy and could not walk. Plaintiff had been in and out of the prison infirmary for observation for three days. During those three days, he had not run a fever; he had no discharge from the wound site; his vital signs were within normal limits; he did not appear to the nursing staff to be in acute distress; the pulses near his knee and ankle were palpable; and he showed no neurological deficits. Most importantly, plaintiff had been placed on an antibiotic regimen by Dr. Sood. Even if Nurse Hawk said when she initially encountered plaintiff in the Healthcare Unit that she did not believe plaintiff, she still had him transported to the Healthcare Unit within a few minutes. Once in the Healthcare Unit, she assessed him and provided him with fluids. Plaintiff has no evidence he would have or should have received different treatment if he had been transported to the healthcare unit earlier. Plaintiff has no evidence Nurse Hawk was deliberately indifferent in her actions toward plaintiff.

Plaintiff also has alleged Nurse Roxanne Hawk was deliberately indifferent to his medical condition, because after she provided hydration treatment, she released plaintiff to security staff and said plaintiff could return to his housing unit and was ambulatory. However, Nurse Hawk exercised her medical judgment to provide treatment to plaintiff. She did not ignore plaintiff. As Dr. Sood indicated, there were no additional medications to be prescribed after he offered plaintiff antibiotics and Nurse Hawk engaged in the proper protocol to hydrate plaintiff, given his presentation. Plaintiff has no evidence his alleged dizziness and headaches were related to any alleged infection in his knee. After plaintiff was hydrated, in exercising her medical judgment, plaintiff appeared to Nurse Hawk to be in a condition to be discharged to security. There is no competent evidence to support the proposition that Nurse Roxanne Hawk was subjectively aware that plaintiff faced a substantial risk of harm. There is no expert testimony that the protocol used by Nurse Hawk was obviously wrong, and there is no basis for a jury to infer that Nurse Hawk was not exercising her professional judgment. Plaintiff has no evidence Nurse Hawk did not exercise her medical judgment or that her treatment was a substantial departure from accepted medical judgment. Furthermore, plaintiff has no evidence that plaintiff was ever at a substantial risk of serious harm by being released to security to return to his housing unit. Nurse Hawk is entitled to summary judgment.

Plaintiff also claims Nurse Roxanne Hawk was deliberately indifferent because when an emergency was called, she would not carry plaintiff from the table in the day room to the ambulance golf cart outside the housing unit. Plaintiff admitted he was initially evaluated at the housing unit; transferred to the Healthcare Unit within 30 minutes; and was treated as soon as he got to the Healthcare Unit.

To be successful in a claim brought pursuant to 42 U.S.C. §1983, plaintiff "must establish not only that a state actor violated his constitutional rights, but also that the violation caused injury or damages." *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011). To recover for any delay in receiving medical treatment cause by defendant's refusal to personally carry plaintiff to the Healthcare Unit and to summon inmates to carry him, he must produce "verifying medical evidence" that establishes the detrimental effect of delay of the medical treatment." *Gabbs v. Wexford Health Sources, Inc.*, ___ F.3d ___, ___, 2019 U.S. App. LEXIS 18097 at 11.

Nurse Hawk has explained that for her own safety as well as the safety of the plaintiff, it was inappropriate for her to carry the litter on which plaintiff was placed. She could have injured herself or she could have dropped the litter and injured plaintiff. Similarly, correctional staff did not allow her to transport plaintiff for security reasons. Security staff, and not medical staff, determines which employees escort inmates throughout the institution. Plaintiff cannot show that the alleged delay of fifteen to thirty minutes before he was transported to the Healthcare Unit caused him any harm.

plaintiff Nurse Hawk is entitled to summary judgment.

### CONCLUSION

Plaintiff was treated for a boil on his knee. After he was prescribed an antibiotic by a physician, he claimed he became dizzy and could not walk to the Healthcare Unit for further evaluation, so security staff requested Nurse Roxanne Hawk attend to plaintiff in his housing unit.

Upon arrival at the housing unit, Nurse Hawk assessed plaintiff. She had him transferred to the Healthcare Unit in a cart. For security and safety reasons, she allowed plaintiff to be carried to the cart by inmates, rather than performing the task

herself. Once at the Healthcare Unit, Nurse Hawk had plaintiff placed in a wheelchair and transported inside the facility, where he was hydrated. There was no delay in providing treatment to plaintiff, and Nurse Hawk engaged in the proper protocol. After Dr. Sood prescribed an antibiotic for any potential infection to plaintiff's knee, there was no additional medication Nurse Hawk should or could have provided to plaintiff .

The evidence establishes Nurse Hawk exercised her professional judgment in treating plaintiff. There is no competent evidence to support the proposition that Nurse Roxanne Hawk was subjectively aware that plaintiff faced a substantial risk of serious harm or that she engaged in a substantial departure from accepted medical judgment. Plaintiff has admitted that after he took the prescribed antibiotic, the knee infection was resolved. Plaintiff disagrees with the manner of the contact he had with Nurse Hawk, but this is not a basis for liability. No reasonable jury could find for plaintiff under these circumstances, and therefore summary judgment is appropriate.

WHEREFORE, for the above reasons, defendant, Roxanne Hawk, respectfully requests this honorable Court grant her motion for summary judgment; assess costs pursuant to 28 U.S.C. §1920 against plaintiff; and grant such further relief as deemed appropriate.

> Respectfully submitted,
> ROXANNE HAWK,
> Defendant,
> CASSIDAY SCHADE LLP,
> Attorneys for Defendant.
> By: /s/ Joseph N. Rupcich

Joseph N. Rupcich
ARDC No. 6283899
CASSIDAY SCHADE LLP
111 North Sixth Street, 2nd Floor
Springfield, IL 62701
(217) 572-1714
(217) 572-1613 (Fax)
jrupcich@cassiday.com

## CERTIFICATE OF SERVICE

Under penalties as provided by law, I hereby certify on October 21, 2019, I caused

to be electronically filed the foregoing Amended Memorandum of Law in Support of Motion

for Summary Judgment with the Clerk of the Court using the CM/ECF system, which

sends a "Notice of E-Filing" to the following:

Hinal A. Patel
Assistant Attorney General
500 South Second Street
Springfield, IL 62701
hpatel@atg.state.il.us
gls@atg.state.il.us

and I caused a true and correct copy of the foregoing Amended Memorandum of Law in

Support of Motion for Summary Judgment to be served upon the following non-CM-ECF

participant:

Sidney Harris M37506
Jacksonville Correctional Center
2268 East Morton Avenue
Jacksonville, IL 62650

by having it deposited in the U.S. mail in Springfield, Illinois, with proper postage prepaid,

on October 21, 2019.

/s/ Joseph N. Rupcich

Joseph N. Rupcich, #6283899
CASSIDAY SCHADE LLP
111 North Sixth Street, 2nd Floor
Springfield, IL 62701
(217) 572-1714
(217) 572-1613 (Fax)
jrupcich@cassiday.com

9283942 KMCNAUGH;MCOVEY